**In re: ADOPTION OF A.C.H.**

**Appeal of: S.H., Biological Mother.**

Superior Court of Pennsylvania.

Submitted May 28, 2002.
Filed July 2, 2002.

Gabriel N. Preston, West Chester, for appellant.

Jean S. Polen, West Chester, for A.C.H.

Rosana I. Chiple, West Chester, for J.D.I.

Edwin C. Kalemjian, West Chester, for Chester County CYS.

Before: HUDOCK, FORD ELLIOTT and BROSKY, JJ.

BROSKY, J.

¶ 1 S.H., the biological mother of A.C.H., appeals the trial court's order granting the petition for the involuntary termination of parental rights.[1] On appeal, S.H. first argues that the trial court abused its discretion in finding that the parental rights should be terminated, despite the fact that no evidence was presented about the nature of the bond between herself and A.C.H., and what effect that termination could have on A.C.H. Second, and similarly, S.H. argues that the termination of parental rights was unwarranted here because CYF failed to establish by "clear and convincing" evidence that the termination would best serve the needs and welfare of A.C.H. Finally, S.H. alleges that the trial court erred in concluding that her current incapacity to provide for A.C.H. could not or would not be remedied within a reasonable period of time. After review, we reverse and remand.

¶ 2 After receiving the testimony of all parties on August 20, 24 and 28, 2001, and after allowing the record to remain open for two weeks to allow the attorneys to file

---

1. Father's parental rights were also terminated, however, he has filed no appeal.

letter briefs regarding any changes in S.H.'s current housing and employment status, the trial court made the following findings of fact.

1. [S.H.] and [J.I.] are the birth parents of a daughter, A.C.H. born on February 23, 1996. CYF became involved with them in October 1996.

2. [S.H.] gave birth to a son this year. The birth father is [A.M.].

3. [S.H.] is insulin dependent for diabetes and at times has gone into diabetic shock. She has a history of mental health issues for which she has inconsistently received treatment. She denies current suicidal ideation, but reports five prior attempts.

4. [J.I.] is currently incarcerated. He received notice of the hearings and is represented by counsel. He attended the morning session of the first hearing and then requested to be returned to the prison at the noon recess. He did not request to attend the subsequent hearings.

5. In July 1997, [S.H.] and A.C.H. moved to Australia. CYF closed the case. It was reopened when they returned to Chester County in November 1997. CYF provided family services and attempted to assist [S.H.] in obtaining stable housing.

6. In May 1998, CYF filed a Petition in which they requested that A.C.H. be adjudicated a dependent child. On or about June 12, 1998, the parties entered a stipulation wherein A.C.H. was adjudicated a dependent child and was to remain in [S.H.'s] primary custody. [S.H.] was to undergo a psychological evaluation and Life Skills and Family Treatment Unit assessments. An Order was entered on June 12, 1998 reflecting the terms of this stipulation.

7. Bruce E. Mapes, Ph.D., an expert in the field of psychology, evaluated [S.H.] in June 1998. His primary diagnosis was borderline personality disorder. He opined that she would benefit from intensive psychotherapy, mental health treatment and medications, but he did not find her to be motivated for treatment. His overall prognosis was very poor.

8. [S.H.] was referred to Holcomb Behavioral Health Systems in November 1998. Holcomb has been assisting her with life skills services, including monitoring her diabetes, budgeting her finances and connecting her with resources and charities for financial assistance.

9. On March 25, 1999, the Court found that it was contrary to A.C.H.'s welfare for her to remain in [S.H.'s] physical custody and A.C.H. was placed in the physical custody of CYF. She has remained in foster care since that time.

10. Throughout the duration of this case, [S.H.] has not maintained stable housing. She has lived in numerous housing arrangements, none of which have lasted for a prolonged period of time and most of them have been emotionally volatile. She has lived with [J.I.] (the birth father), [A.M.] (her son's father), with A.C.H.'s paternal grandmother, with various friends, in shelters and on her own. There is a history of domestic violence with [J.I.] as well as with [A.M.] In March 1997, [S.H.] filed a PFA, resulting in [A.M.'s] incarceration. In June 2000, she called the police after an altercation with [A.M.]. She is presently living with [A.M.] and their baby son in Lehigh County.

11. Throughout the duration of this case, [S.H.] has not maintained stable employment. She has had in excess of twenty jobs, with only two lasting more than six months. She has a pattern of

exceeding allowed absences and has had problems with coworkers.

12. On April 5, 2000, the Court ordered [S.H.] to attend all recommended mental health counseling and take all medications as prescribed. Her visits with [S.H.] continued to be unsupervised, however, A.C.H. was not allowed to be in [A.M.'s] presence. Overnight visitations were not allowed unless and until [A.M.] no longer lived with [S.H.]

13. Since April 2000, [S.H.'s] visitations with A.C.H. have been sporadic. During January and February 2001, health problems with her second pregnancy legitimately prevented [S.H.] from making the trip from Lehigh County. There were no visitations from June through August 2001.

14. On September 25, 2000, the Court found that no progress had been made to alleviate the circumstances that necessitated the original placement. [S.H.'s] housing and employment instability had continued and she had not been consistently receiving treatment for her mental health issues.

15. On April 16, 2001, after this Petition was filed, the parties entered into a Stipulation wherein they agreed that [S.H.] would have weekly, supervised and three hour visits with A.C.H., on the conditions that she maintain appropriate housing and employment, continue with mental health treatment and medical treatment for her diabetes and execute a release giving CYF access to that information.

16. [S.H.] is currently receiving mental health treatment at Lehigh Valley Hospital for depression and to improve her level of functioning. Her therapist, John Illingworth, testified that she has made progress in her individual therapy. She is currently on antidepressant and mood stabilizer medications.

17. On August 28, 2001, [S.H.] testified that she was evicted from her apartment because she was two months behind on her rent. She stated that she and/or [A.M.] would be able to pay the back rent and she would return to the apartment the next day.

18. [S.H.'s] attorney states in his September 12, 2001 letter brief that she did not return to the apartment, but is once again living with A.C.H.'s paternal grandmother.

19. [S.H.] testified on August 28, 2001 that on the previous day she was hired at Dynamic Marketing Group, Inc. as a part-time marketer. At the Court's request, her attorney provided a facsimile of a letter from someone claiming to be her supervisor. The letter did not sufficiently demonstrate that she was currently employed. It was nothing more than a handwritten letter on paper without a letterhead that could have been written by anyone.

20. [S.H.] is currently on food stamps, is unable to pay her rent on a timely basis and can not afford to pay for repairs to her car.

21. [S.H.] testified that she loves A.C.H. and feels bonded to her. She has a strong desire to provide the necessary care for A.C.H.

22. CYF changed its goal to adoption because [S.H.] did not remedy her unstable housing and employment conditions and was not regularly attending mental health counseling. In short, although there seemed to be a brief period around September 1999 when [S.H.'s] situation improved, the same patterns of instability continued in spite of the multitude of services that were provided to her.

23. [J.I.] has not been involved with and shows no interest in A.C.H.

24. [J.I.] contacted CYF in July 2000 to arrange visitation with A.C.H. Three visits were scheduled. [J.I.] had one visit and cancelled the others. As such, Dependency Court suspended his visitation.

25. [J.I.] has failed to provide any support, either financial or emotional. He has not sent clothing, gifts or cards to A.C.H. Little is known of his employment history.

26. A.C.H. has been in placement for at least 15 of the last 22 months. CYF's adoptive resource is A.C.H.'s current foster parents, with whom she has lived since her placement on March 12, 1999.

Trial Court Opinion, November 27, 2001, at 1–6.

¶ 3 After making these findings of fact, and providing a legal discussion regarding both parents, the trial court entered an order involuntarily terminating the parental rights of both S.H. and J.I. and allowing for the future adoption of A.C.H. S.H. then filed this timely appeal.

¶ 4 The standard of review in cases involving the potential termination of parental rights is limited to a determination of whether the trial court's order is supported by competent evidence. *In re Julissa O.*, 746 A.2d 1137 (Pa.Super.2000). We are bound by the findings of the trial court, which have adequate support in the record so long as the findings do not evidence a capricious disregard for competent and credible evidence. *In re Diaz*, 447 Pa.Super. 327, 669 A.2d 372 (1995). Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by finder of fact. *In re B.G.S.*, 418 Pa.Super. 588, 614 A.2d 1161 (1992).

¶ 5 The burden of proof is upon the party seeking termination to establish by "clear and convincing" evidence the existence of grounds for doing so. *In re L.S.G.*, 767 A.2d 587 (Pa.Super.2001). In this case, in order to terminate S.H.'s parental rights to A.C.H., the petitioner was required to establish the grounds for terminating the parental rights by clear and convincing evidence by demonstrating the applicability of 23 Pa.C.S.A. § 2511, which, in pertinent part, states:

(a) **General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(5) The child had been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and **termination of the parental rights would best serve the needs and welfare of the child.**

(b) **Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511 (emphasis added).

¶ 6 Here, we agree with the trial court that CYF has established by clear and convincing evidence that S.H. is currently incapable of adequately parenting A.C.H. due to her continued unstable lifestyle.

However, the above-highlighted clause of § 2511(a)(5) as well as subsection (b) requires that before severing the parent-child relationship, the court is required to consider the best interests of the child. *See In re Adoption of B.J.R.*, 397 Pa.Super. 11, 579 A.2d 906 (1990) (stating that factor in making a determination of whether parental rights should be terminated under subsection (a)(5), whether termination would best serve the needs and welfare of the child, was not mere formality flowing from the existence of other required elements, but instead was a discrete consideration). In arguments one and two, Appellant alleges that the trial court erred in terminating S.H.'s rights because CYF failed to present any evidence of the emotional bonds between mother and daughter and what effect a termination would have on daughter. In support of these arguments, Appellant cites our Supreme Court's holding in *In re E.M.*, 533 Pa. 115, 620 A.2d 481 (1993).[2]

¶ 7 We find our Supreme Court's holding in *In re E.M., supra*, to be instructive here. In that case, an action was brought to involuntarily terminate a mentally retarded mother's parental rights. Our Supreme Court held that although there was evidence that mother had been unable to provide proper care for her children, it reversed and remanded on the basis that her parental rights could not be involuntarily terminated without consideration of the emotional bonds she had with her children. *In re E.M., supra.* As our Supreme Court has stated:

It is clearly conceivable that a beneficial bonding could exist between a parent and child, such that, if the bond were broken, the child could suffer extreme emotional consequences. This is true regardless of whether adoption is imminent. To render a decision that termination serves the needs and welfare of the child without consideration of emotional bonds, in a case such as this where a bond, to some extent at least, obviously exists...is not proper.

*In re E.M., supra*, at 485.

¶ 8 More recently, in *In re Adoption of Charles E.D.M.*, 550 Pa. 595, 708 A.2d 88 (1998), and *In re Adoption of A.M.R.*, 559 Pa. 422, 741 A.2d 666 (1999), the Court has similarly reversed and remanded these cases on the basis that the parental rights in question should not have been terminated without an adequate on the record evaluation of the needs and welfare of the children. In the Per Curiam Order entered in *In re Adoption of A.M.R.*, 559 Pa. 422, 741 A.2d 666, the Court specifically provided that in conducting this analysis the trial court was to consider "whatever bonds may exist between the children and [a]ppellant, as well as the emotional effect that termination will have upon the children." *Adoption of A.M.R., supra*, citing *Adoption of Charles E.D.M., supra* citing *In re E.M., supra.*

¶ 9 In the present case, we note that although the trial court did reference the needs and welfare of A.C.H. in arriving at its decision to terminate her parental rights, it did so in a conclusory fashion.[3] Our review leads us to conclude that there

---

**2.** The minor also alleges the trial court erred in terminating the parental rights because CYF did not sustain its burden of proof and she also cites *In re E.M., supra.* in support of her argument that this case should be remanded for consideration of the bonding question.

**3.** As it stated, "[i]t is clear that A.C.H.'s needs and welfare will be best promoted by terminating her birth parents' rights so that she may be adopted either by her foster parents or by other eligible families, and raised in a stable home." Trial Court Opinion, November 27, 2001, at 10.

is not sufficient evidence in the record to address the emotional bonds S.H. and A.C.H. share. Accordingly, we believe the trial court has failed to adequately address that issue before terminating S.H.'s parental rights and we find that CYF has failed to clearly and convincingly establish that such termination would be in the best interests of the child.

¶ 10 As our distinguished Court has so aptly noted, "[w]e cannot underestimate the importance of a child's relationship with his or her biological parents." *Adoption of Charles E.D.M., supra*, at 93. Furthermore, we are mindful of the fact that continuity of relationships is important to a child, and we agree that severance of close parental ties through a termination of parental rights can be extremely painful. *In re C.S.*, 761 A.2d 1197 (Pa.Super.2000). With these considerations in mind, we are constrained to reverse and remand this matter to give the parties an opportunity to present further testimony regarding the emotional bonds between mother and daughter, and the effect a termination of parental rights would have on A.C.H. Subsequent to such hearing, the trial court shall conduct an analysis regarding this issue as well as all other factors bearing upon the termination of S.H.'s parental rights. *See E.M., supra.*

¶ 11 Reversed and remanded for proceedings consistent with this decision. Jurisdiction relinquished.