J-S15043-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF T.L.R. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: S.M.R. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1742 WDA 2019 |

Appeal from the Order Entered October 15, 2019
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  No. 42 of 2019

| | | |
|---|---|---|
| IN RE: ADOPTION OF S.M.R. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: S.M.R. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1743 WDA 2019 |

Appeal from the Order Entered October 15, 2019
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  43 of 2019

| | | |
|---|---|---|
| IN RE: ADOPTION OF G.L.R. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: S.M.R. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1744 WDA 2019 |

Appeal from the Order Entered October 15, 2019
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  No. 44 of 2019

J-S15043-20

BEFORE: BENDER, P.J.E., OLSON, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED MARCH 20, 2020**

S.M.R. ("Father") appeals from the Orders entered on October 15, 2019, in the Court of Common Pleas of Westmoreland County, Orphans' Court Division, involuntarily terminating his parental rights to his female, dependent children, T.L.R. (born in June 2007), S.M.R. (born in October 2009), and G.L.R. (born in September 2017) (collectively, the "Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. §§ 2511(a)(5), (8), and (b).   We affirm.[1]

In its twenty (20) page Order of Termination entered on October 15, 2019, the trial court fully and correctly detailed the relevant facts and procedural history of this case; therefore, we will not restate them herein.[2] Procedurally, we add that this Court consolidated Father's appeals *sua sponte* in a Per Curiam Order entered on December 16, 2019.

In his appellate brief, Father raises one issue for this Court's review:

> Whether the trial court erred as a matter of law by failing to discern the nature of the parent-child bond and the affect severing the bond would have on the minor children.

Brief for Father at 4.

_____

[*] Former Justice specially assigned to the Superior Court.
[1] We note that Appellant has filed separate notices of appeal in each docket pursuant to **Commonwealth v. Walker**, 185 A.3d 969, 977 (Pa. 2018) (holding that quashal is required where litigants fail to file separate notices of appeal from an order resolving issues on more than one docket number).

[2] In its "Order of Court Pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure" filed on November 15, 2019, the trial court indicated that the rationale behind its October 15, 2019, Order is contained therein.

- 2 -

In support of his claim, Father asserts that the trial court's Order was the result of an April 15, 2019, hearing on the Westmoreland County Children's Bureau's ("the Bureau") Petition for Involuntary Termination of Parental Rights. Father stresses that at that time, Margaret D. Ferguson, a therapist who provides parenting and therapeutic supervised visits for Nevaeh, Inc., testified S.L.R. was "so excited to see [Father]" and the children had a difficult time leaving visits with him. Father's Brief at 5 *citing* N.T., 4/15/19, at 21, 25.[3] Father posits that the Bureau failed to present any required evidence as to whether a bond between the Children and Father existed, except for that of Ms. Molly Clayton, its supervisor, who responded "yes" when asked whether in her opinion termination of parental rights supported the developmental, physical, and emotional needs and welfare of the children." Father's Brief at 11 *citing* N.T. 4/15/19, at 87. Father concludes that without presenting sufficient evidence regarding the bond he shared with

_____

[3] This referenced transcript is not contained in the certified record, and as we will discuss, *infra*, it appears as though no hearing had been held on that date. Rather, this was the date upon which the Petitions for Involuntary Termination of Parental Rights were filed. We remind Father that "[t]his Court may review and consider only items which have been duly certified in the record on appeal. Furthermore, a document not filed of record does not become part of the certified record by merely making a reproduction and placing that reproduction in the reproduced record. For purposes of appellate review, what is not of record does not exist." ***Rosselli v. Rosselli***, 750 A.2d 355, 359 (Pa.Super. 2000) (citations omitted). However, even if such a transcript exists, it is not vital to our review herein; therefore, this omission is not fatal to our disposition of Appellant's issue.

his Children, the trial court lacked sufficient evidence from which to make a proper decision.

Appellate review of an order terminating parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. ... We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).

Moreover, as the finder of fact, the trial court is the sole determiner of the credibility of witnesses, and all conflicts in testimony are to be resolved by the finder of fact. The party seeking termination bears the burden of proof to establish by clear and convincing evidence the existence of grounds for doing so. *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted).

The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come

to a clear conviction, without hesitation, of the truth of the precise facts in issue. This Court may uphold a termination decision if any proper basis exists for the result the trial court has reached. If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. **In re Z.P., supra** at 1115-16 (quoting **In re Adoption of K.J.**, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

Initially we note that Father's assertion to the contrary, the record reveals that proceedings were held prior to termination. At the May 29, 2019, fast track termination proceeding, the trial court was informed that Father indicated from Fayette County Prison that he wished to contest the termination of his parental rights to the Children. N.T. 5/29/19, at 2. The matter was continued, and during the involuntary termination proceeding held on September 12, 2019, the Bureau provided the trial court with ample evidence from which it could discern the nature of the parent-child bond between Father and the Children.

Ms. Ferguson testified that Father's sporadic attendance at scheduled visits with the Children caused them to suffer. She explained that Mother was more engaging, interactive and nurturing with the Children than Father. Specifically, she observed Father rebuke Children's attempts to show him affection and to participate in activities with him at the initial visit. N.T. 9/12/19, at 20-22. Ms. Ferguson stressed that the biggest barrier to Father's

reunification with the Children was his "inability to consistently commit to the kids.. . [he] just can't be there for the kids. Out of 54 opportunities. . . dad showed up [eight]." *Id*. at 24, 28.[4]  Father had no contact with the Children in June, July, August or September of 2018, though several visits had been arranged and confirmed during that time-period. *Id*. at 29.

In addition, Ms. Nicole Pizzola, a therapist with King and Associates, Inc., testified as an expert in therapeutic supervised visitation.  She stated the oldest child, T.L.R., was upset by her parents' drug use in front of her sisters and her, which she felt affected the Children's care and caused the family often to lack money for food and to move from home to home.  T.L.R. also stated her parents had told the Children "not to say anything about the problems to anyone and to lie." *Id*. at 65.

Finally, Ms. Molly Clayton, the Bureau's caseworker supervisor, explained that T.L.R. and S.M.R. had become "parentified," meaning they viewed themselves as the adults in the household, and particularly felt the need to ensure G.L.R. had her bottle and her other basic needs met. *Id*. at 74-75.  Ms. Clayton observed that "the girls would seeks some attention and affection, and [Father] was very nonchalant and nonengaging about that." *Id*. at 78.  Ms. Clayton testified that the conditions which led to the Children's removal, "[l]ack of housing, lack of income, untreated mental health,

_____

[4] Ms. Ferguson initially stated Father attended five visits, but later clarified he had been present for eight of the proffered fifty-four.

untreated drug and alcohol, continued criminal concerns," continue to exist. *Id*. at 85.  Father did not request visits with the Children while incarcerated. *Id*. at 100-01.

When asked if terminating Father's parental rights would result in the severing of a beneficial relationship between Father and the Children, Ms. Clayton posited it would not and stated the following:

> The girls are in a foster home where they are able to be children.  They are having their mental health needs met.  They are able to socialize.  They are able to focus on children activities, not are we going to have a bed to sleep in, is mom going to get her food, are there drugs in the home.
> They're able to be children.  They don't have to worry about getting up for school, that they will be taken to school, they can do homework.  They're socializing.  They're thriving in that regard.
> \*\*\*
>
> [T.L.R. and S.M.R.] acknowledge that [Father] and [Mother] are their biological parents;  However, they don't seek them for meeting their basic needs.  They know they can look to [Foster Parents] for stability, for guidance.
> As I stated before, they don't have to worry about where they're going to be laying their head at night, where food is coming from.  They're able to be children.  [G.L.R.] has never known another caregiver than [Foster Parents].

*Id*. at 86, 90-91.

Throughout his brief direct testimony at the termination hearing, Father did not dispute the testimony of the Bureau's witnesses, yet he maintained that he shared a close relationship with the Children.  N.T., 9/12/19, at 103-106.  His responses to questions on cross-examination and redirect

examination did not establish a clear plan for his or his Children's future. *Id*. at 108-37.

In its Order filed on October 15, 2019, which evinces a thorough review of the record, the arguments of the parties and the applicable law, the trial court properly disposes of Father's claim herein that the court did not consider the ramifications termination of his parental rights would have on his bond with the Children. Therein, the trial court observed, *inter alia*, that Father did little to nurture the Children and facilitate visits with them either before or during his incarceration. Father last saw the Children, who do not rely upon him for their basic needs, in February of 2019, and he never requested visits with the Children while incarcerated. The court found the Children had been deprived of necessary physical and emotional care from Mother and Father for years and, instead, were encouraged to take on a parental role and to lie for their parents' benefit. Order and Opinion, 10/15/19, at ¶¶ 49, 52, 58, 61, 65.

Importantly, in finding the termination of Father's parental rights would be in the Children's best interests, the trial court stressed that:

> [a]lthough Father now protests the termination, when he has had the opportunity to nurture his bond with the Children, he has been dismissive, rejecting, self-centered and absent. The Children rarely, if ever, appear to care about him. Father's continued incarceration renders him unavailable to parent. The Children understand and are resigned to the limitations and disabilities of their Parents; their desire to be in a stable household with caring, competent parents overrides any bond they may have with either Parent. There is a strong, demonstrable bond between the Children and the foster parents.

*Id*. at ¶ 74.

- 8 -

In light of all the foregoing, our review of record supports the trial court's decision; therefore, we see no reason to disturb it. ***See In re Z.P., supra***. Accordingly, we affirm.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/20/2020