J-S18040-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: M.A.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 133 WDA 2025 |

Appeal from the Decree Entered January 13, 2025
In the Court of Common Pleas of Butler County Orphans' Court at No(s):
2023-00036A

BEFORE: DUBOW, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED: July 30, 2025**

M.S. ("Mother") appeals from the decree entered in the Court of Common Pleas of Butler County Orphans' Court, which involuntarily terminated her parental rights to her minor son, M.A.S. (born June 8, 2008) (hereinafter "Child"), pursuant to Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938. At issue is whether the orphans' court abused its discretion by failing to set forth a statutorily compliant Section 2511(b) analysis and to acquire Child's consent to adoption pursuant to the dictates of Section 2711. After a careful review, we discern no error with either the orphans' court's Section 2511(b) analysis or its resultant decree terminating Mother's parental rights without Child's consent. Accordingly, we affirm.

---

[*] Former Justice specially assigned to the Superior Court.

The orphans' court's "Findings of Fact and Opinion" dated January 7, 2025, includes relevant case facts, procedural history, and the reasons behind the orphans' court's decision to terminate Mother's parental rights because, *inter alia*, there existed the lack of an emotional bond between Mother and Child necessary and beneficial to Child. An excerpt of the opinion follows.

> Three days of testimony was received [on] February 22, May 3, and July 22, 2024, on the Petition for Involuntary Termination of Parental Rights ("IVT") filed July 19, 2023, by the Butler County Children and Youth Services ("Agency") against birth mother, [("M.S." or "Mother")], regarding the minor child, M.A.S., age 16 [] ("Child"). The Child's birth father [] died [in] 2009. . . . Mother was personally served with the IVT Petition on January 29, 2024, which is in excess of the minimum ten (10) day requirement. The first day of the evidentiary hearing was February 22, 2024.
>
> [During the IVT matter, Mother received both a court-appointed counsel to represent her legal interests and a Guardian *ad Litem* ("GAL"). By separate orders, Child also received court-appointed counsel and a GAL].[fn]
>
> ---
>
> > Fn. [Child] suffers from significant physical and mental infirmities. He does not understand the nature of the IVT proceeding and is unable to articulate or express in writing any notion of a preferred and desired outcome, including but not limited to whether he is interested in maintaining contact with birth mother.
>
> ---
>
> Also pending [before the orphans' court was] the Agency's Motion for Goal Change filed in Dependency action at D.P. No. 45 of 2022.
>
> The Agency assert[ed] four (4) statutory grounds under Section 2511(a) . . . for involuntary termination of Mother's parental rights to the Child [pursuant to subsections (1), (2), (5), and (8), and the trial court discusses ample evidence adduced at the hearing

upon which it relied to find that the Agency met its burden of presenting clear and convincing evidence for all grounds alleged under Section 2511(a).]

. . .

[With respect to the orphans' court's Section 2511(b) analysis, the court's opinion provided the following:]

> **(b) The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of Child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of parent. With respect to any petition filed pursuant to subsection (a)(1), the court shall not consider any efforts by the parents to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.**

First and foremost, the orphans' court is giving primary consideration to the needs and welfare of Child in rendering the decision. With respect to Section (a)(1) and (a)(8), the orphans' court is not considering any efforts by Mother to remedy the conditions described therein, which were first initiated after [she received] notice of the Petition's filing. However, the orphans' court has considered the evidence under the other sections, as it is appropriate.

"In a case involving the termination of parental rights, the trial court is required to consider whatever bond may exist between Child and parent, as well as the emotional effect that termination will have upon Child." *In re Adoption of A.C.H.*, 803 A.2d 224, 229 (Pa. Super 2002). [The orphans' court] agrees with Dr. Bernstein's expert opinion that, while [Child] may feel an emotional bond toward his mother, it is not reciprocal. The benefits derived by proceeding to adoption with terminating Mother's parental rights[] outweigh any emotional harm resulting from severing parental bonds between the Child and his mother. Child is safe and doing well residing with his maternal aunt and

the other individuals residing in [Aunt's] home. The strong bond between Child and his older sister can be maintained, so long as [sister] chooses to live there.

It is no surprise that the minor child is bonded with Mother. Mother likely loves her son, and Child display[s] love toward Mother, despite his cognitive infirmities. However, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *In r T.S.M.* 71 A.3d 251, 267 (Pa. 2013). Stability and family permanence are critical to the health and welfare of dependent Children and must take priority. Mother's minimal efforts, perhaps caused by her mental health concerns, indicate a clear inability to ensure the safety and well-being of a child, specifically with attending to his special medical, educational, and emotional needs. [Child] needs to be safe and stable above all else. Safety, permanency, and the well-being of a child, ". . . must take precedence over all other considerations." *In re SB.*, 943 A.2d 973 (Pa. Super. 2008).

In summation, [the orphans' court] recognizes that, regrettably, [] Child may suffer some grief and loss with the termination of Mother's parental rights. [Mother] had excellent opportunities for reunification yet showed no initiative. Ultimately, involuntary termination followed by adoption will meet [] Child's best interest by ensuring a safe, stable, and permanent home for him.

The issue of [Child] having the mental capacity to provide consent to adoption shall be addressed by separate Order.

Findings of Fact and Opinion, 1/7/2025, at 1, 2, 27-28.

Mother raises the following issues for appeal:

1. Whether the trial court erred and abused its discretion by issuing a decree terminating natural mother's parental rights, but failing to fully set forth its analysis under section 2511(B) as required by statute.

2. Whether the trial court erred and abused its discretion by issuing a decree terminating natural mother's parental rights, but failing to address the issue of whether the minor child has the capacity to the termination of natural mother's parental rights or a subsequent adoption.

J-S18040-25

Brief of Appellant, at 7.

In reviewing an appeal from a decree terminating parental rights, we adhere to the following standard:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the [orphans'] court if they are supported by the record, but it does not require the appellate court to accept the [orphans'] court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the [orphans'] court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the [orphans'] court's decision, the decree must stand. We have previously emphasized our deference to [orphans'] courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the [orphans'] court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 255 A.3d 343, 358-59 (Pa. 2021) (quotation marks, brackets, and citations omitted).

Termination of parental rights is governed by 23 Pa.C.S.A. § 2511, which requires a bifurcated analysis. *See id.* at 359. "Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a)." *In re C.M.K.*, 203

- 5 -

A.3d 258, 261-62 (Pa. Super. 2019) (citation omitted).  If the orphans' court determines the petitioner established grounds for termination under section 2511(a) by clear and convincing evidence, the court then must assess the petition under subsection 2511(b), which focuses on the child's needs and welfare.  ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).  Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."  ***Matter of Adoption of L.C.J.W.***, 311 A.3d 41, 48-49 (Pa. Super. 2024) (citation omitted).

Mother concedes evidence sufficed to prove that her conduct satisfied the grounds for termination provided in Section 2511(a).  She contests, however, the orphans' court's determination that clear and convincing evidence existed to terminate her parental rights pursuant to Section 2511(b).  Section 2511(b) provides:

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(b).

Specifically, Mother argues that the orphans' court failed to set forth fully a requisite Section 2511(b) analysis, which, she maintains, consisted only of the court's observation that the Child "may suffer grief" as a result of the severance of the bond he has with Mother.  ***See*** Brief of Appellant, at 15.  A

review of the record belies Mother's claim and reveals, instead, that the orphans' court conducted an appropriate Section 2511(b) assessment below.

Our analysis focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. **T.S.M.**, 71 A.3d at 267. "[T]he determination of the child's needs and welfare requires consideration of the emotional bonds between the parent and child. The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond." **Id.** (quotation marks omitted). It is not enough that there exists a bond between parent and child to avoid termination. **See Interest of K.T.**, 296 A.3d 1085, 1109 (Pa. 2023). Rather, the orphans' court must determine whether the bond is "necessary and beneficial" to the child, such that "maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." **Id.** at 1105-06. Focusing upon the "child's development, and mental and emotional health," the orphans' court should assess whether severing the bond "is the kind of loss that would predictably cause extreme emotional consequences or significant, irreparable harm" to the child. **Id.** at 1110-11.

Additionally, "the parental bond is but one part of the overall subsection (b) analysis[.]" **Id.** at 1113. The needs and welfare analysis must also include the consideration of factors such as: "the child's need for permanency and length of time in foster care ...; whether the child is in a pre-adoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible

needs of love, comfort, security, safety, and stability." *Id.* (citations omitted). "These factors and others properly guide the court's analysis of the child's welfare and all [their] developmental, physical, and emotional needs." *Id*. Importantly, "[orphans'] courts have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs." *Id*.

Thus, a court must examine the matter from the child's perspective, placing his "developmental, physical, and emotional needs and welfare above concerns for the parent." *Id.* at 1105. "[T]he law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved." *T.S.M.*, 71 A.3d at 268-69. The party seeking termination bears the burden of proving, by clear and convincing evidence, that termination of parental rights serves a child's needs and welfare. *K.T.*, 296 A.3d at 1105.

The orphans' court's opinion provides an extensive "needs and welfare" analysis spanning 17 pages of its opinion, in which it demonstrates its apt consideration of Section 2511(b) precepts and applies them to Child's case prior to reaching its decision to terminate Mother's parental rights. Particularly relevant from the court's thorough recitation of evidence is Mother's longstanding failure, despite Agency efforts during the dependency term, to make decisions and adopt behaviors necessary to maintain a parent-child bond with Child. We select the following excerpts to illustrate the orphans' court's careful review:

This Juvenile Dependency case opened with the Agency in August 2021, due to the Child not attending significant medical appointments. Over the succeeding months, the Agency assisted the family with transportation and other essential needs. On May 5, 2022, the Agency filed the dependency Petition, generally alleging the family displayed numerous barriers to self-sufficiency.

. . .

Regarding M.A.S., the Agency alleged the Child suffers from many health ailments, which required additional specialized care. [Child] suffers from an intellectual disability and is unable to attend to his basic daily needs, such as feeding and toileting. Mother disregarded her son's overall hygiene by failing to frequently change his diaper. Child often attended school in a soiled diaper.

The Child is diagnosed with Spastic Diplegic Cerebral Palsy, displayed by inward turning legs, significantly hindering his ability to walk. In September 2021, medical professionals recommended Child be fitted with shorter leg braces to assist his ability to walk. However, Mother insisted her son be fitted with larger leg braces. She agreed Child would attend extensive physical therapy.

In January 2022, Child began attending school in-person, where he was supposed to continue with physical therapy. The Agency noted there were reports the Child, while in Mother's care, was neither using his leg braces[] nor attending physical therapy. His doctors reported there were nine (9) missed appointments. Mother did not answer or return telephone calls from medical providers. The Child's physical condition worsened. The long-term prognosis, if he did not receive specialized medical attention, would be further degeneration of his physical condition, evidenced by the Child's legs further turning inward.

Child was also under weight, which the Agency attempted to address with Mother but she failed to administer the Child's prescribed weight-gaining medication. One of the biggest issues Mother faced was the lack of available transportation because she did not have a driver's license or vehicle. The Agency contracted with Totin Family Services ("Totin") to assist Mother with her transportation needs. The Agency also offered her assistance to obtain a learner's permit and to pay for driving lessons in order

for Mother to get a license. Mother failed to get the learner's permit. The Agency further alleged Mother forgot many appointments, despite Totin arranging for transportation and appearing at her home, only to learn Mother was sleeping.

The Agency held a Rapid Response Meeting on April 22, 2022, to develop a safety plan. Mother failed to take appropriate action and follow the plan in full.

. . .

Prior to the originally scheduled Adjudication hearing on June 13, 2022, Child's [older] sister [ ] disclosed to both children's court-appointed GAL [] that she was afraid of her mother and afraid for Child's safety in the home. [Sister] also disclosed a concern Mother was engaging in prostitution acts in the family home, when the children are present.

[Sister] further informed her GAL that she was the primary caregiver for her physically and mentally compromised younger brother. [Sister] feared [Child] was not being cared for properly. Judge Kubit entered an Order approving the detention of Child on June 13, 2022.

A Shelter Care Order was entered June 15, 2022, finding it was not in the best interest of the Child to remain in Mother's home. The Agency was granted legal and physical custody of Child, with Mother entitled to supervised visitation a minimum of twice a week for two (2) hours each visit.

[At the Adjudication hearing held before [the orphans' court] on July 11, 2022, the Agency amended its Petition to include additional information [that Mother voluntarily admitted herself into an inpatient mental health facility on June 29, 2022, with anticipated discharge on July 14, 2022.] She participated in the Adjudication hearing via telephone and read a statement into the record requesting that both children be returned to her care upon her "anticipated" release from the hospital. There was no credible evidence presented to indicate Mother would be released from inpatient mental health treatment, as she anticipated. Both [Child] and his older sister were deemed dependent pursuant to the Agency's Petition. The disposition hearing was scheduled for August 18, 2022.

. . .

After hearing held on August 18, 2022, the Disposition Order was entered, which concluded the best interest of the Child would be to remain placed with Maternal Aunt.

. . .

[Over the next year], Mother's compliance with the Child's Permanency Plan continued to be considered minimal. She was unable to exercise visitation, due to a recent hospitalization for mental health treatment and the passing of her father. However, the Agency arranged for Mother to have daily telephone contact with [Child]. These visitations were generally without incident, aside from the occasional need to re-direct Mother by the Totin visitation supervisor. The Agency continued with legal and physical custody. Mother's supervised visitation remained at once each week for four (4) hours per visit. . . . Mother was permitted evening phone calls with [Child].

The Agency filed a Petition for Involuntary Termination of Parental Rights on July 19, 2023. . . . At the August 4, 2023, PRH hearing, Mother was still minimally progressing toward alleviating the circumstance necessitating the original placement of the Child. [Despite Mother receiving mental health services and counseling sessions,] there were no changes to the goals and tasks required of her to reach [her] goals. [She continued to demonstrate difficulty functioning independently, as displayed in her repeated failures to] prepare meals for the Child prior to, or during, visitations. . . .

By Order dated September 1, 2023, the Agency's motion requesting Mother undergo parental capacity and bonding assessments was granted. Counsel for Mother and the Child's GAL agreed to utilize Dr. Eric Bernstein for these assessments.

On October 24, 2023, the Agency filed a motion to reduce Mother's visitation by two (2) hours [every Tuesday,] as Mother began attending a church group on Tuesday evening, despite selecting Tuesday evenings as her visitation night. The Agency further alleged that Mother was becoming very combative and argumentative with the provider's staff during the visitation with her son. . . .

A second motion dealing with supervised visitation was presented by the Agency on October 24, 2023. This Motion alleged Mother was failing to meet the Child's needs during the supervised visits in her home, dure to her displaying ongoing aggressive tendencies toward the visitation supervisor. The Agency requested Mother's supervised visitation be reduced to the statutory minimum of once every two (2) weeks for one (1) hour and occur at the provider's facility. . . .

At the November 6, 2023, PRH, the [orphans' court] found Mother continued making minimal progress with the Permanency Plan by speaking negatively about her sister serving as the kinship placement provider. The supervised visits with the Child continued to deteriorate. . . . Mother remained aggressive and combative [with Totin staff]. She was also spending too much time on her phone during the visits. Mother could not function and remained incapable of providing for the Child's special needs.

The Agency filed a motion requesting the placement goal change from reunification to termination, which was consolidated and to be heard with the IVT hearing. . . . The testimony received on Day 1 of the IVT hearing was deemed relevant and appropriate for incorporation into a *de facto* PRH Order. An incident occurred on January 23, 2024, at Totin prior to Mother's scheduled visitation. Among other inappropriate requests, Mother requested to view Totin's business records and employee safety clearances. She was agitated and disruptive. . . . Throughout the Dependency case, Mother refused to sign the authorizations requested by the Agency, such as her medical and mental health records.

. . .

[Child] continues to do well in the pre-adoptive kinship placement with the Maternal Aunt. The Child's older sister [] also resides with Maternal Aunt. A strong sibling exists [sic] between [sister] and her younger brother.

. . .

The final PRH was held on August 12, 2024. Mother voluntarily discontinued supervised visitation with [Child]. The criminal prosecution against her stemming from the March 12, 2024, disruptive incident at the Agency's offices remained pending. Mother remains combative and resists participating in any of the

multitude of treatment services offered to her. [Child] is expecting to undergo hip surgery, after all pre-operative requirements are met. He will be attending school at the Children's Institute in Pittsburgh. The Child remains stable, safe, and secure residing in his pre-adoptive kinship home, despite the ongoing toxic relationship brought on by Mother against her sister. . . . [According to the kinship placement administrator who worked on Child's case,] the Maternal Aunt provides her nephew with a stable, nurturing, and loving environment without any safety concerns.

. . .

Dr. Eric Bernstein opened the testimony on May 3, 2024, and was qualified as an expert witness (Exhibit 4). He performed a parental capacity assessment of Mother and an assessment to determine whether an emotional bond is evidence between Mother and her son. Dr. Bernstein's written report dated December 20, 2023, was admitted into evidence without objection (Exhibit 5).

Dr. Bernstein is concerned about Mother's own well-being, both physically and mentally. He opines these challenges with the accompanying limitations and needs infringe upon Mother's ability to effectively provide day-to-day care and attention for the Child. When coupled with Childs' significant physical and mental infirmities that must always be addressed under a watchful eye, Dr Bernstein does not recommend reunification. Dr. Bernstein insightfully weighed "the depth of the Child's needs against Mother's significant psychiatric and physical challenges in reaching the parental assessment conclusion.

. . .

Regarding the bonding assessment, Dr. Bernstein interviewed Mother and her sister, who provides Child's pre-adoptive kinship placement home. Due to his significant mental infirmities rendering him unable to communicate, [Child] was not able to provide much input into the bonding assessment. There may be a strong emotional bond from the Child's perspective. Dr. Bernstein observed the connection from Mother to her son is neither reciprocal nor observable. Dr. Bernstein believes Mother is unable to provide the Child with a nurturing bond.

. . .

Agency Caseworker Dalton Shuler was assigned to the dependency case on July 1, 2022, at a time [Child] and his older sister were placed outside of Mother's home with the children's Maternal Aunt residing in Washington County, Pennsylvania. . . . Coordinating out-of-county transportation was a significant obstacle which the Agency overcame. Mother often spent time on the phone during the supervised in-home visits with her son.

. . .

Mr. Dalton feels the Child views "home" as the Maternal Aunt's residence. Child is bonded with Chris, who is a friend of the kinship family. . . .

Orphans' Court Opinion, 1/7/2025, at 1-10.

Contrary to Mother's allegation that the orphans' court conducted a superficial Section 2511(b) analysis, the orphans' court's opinion reflects a thorough review of testimony provided by both fact witnesses and a medical expert bearing on the bonding question. Based on the record before us and our standard of review, we discern no abuse of discretion with the orphans' court's conclusions that Child is bonded with his Maternal Aunt in her pre-adoptive kinship home more so than he is with Mother, that his needs and welfare are best served there, and that he will not be irreparably harmed by terminating Mother's parental rights. *See K.T.*, 296 A.3d at 1113. The record otherwise reflects Mother's complete inability to parent her children and care for Child's needs, and, given this record, the orphans' court reasonably determined that despite the possibility of a bond existing between Child and Mother, all the other special developmental, emotional, and physical needs and welfare considerations attendant to Child warranted terminating Mother's

- 14 -

parental rights. ***See Interest of M.E.***, 283 A.3d 820, 839 (Pa. Super. 2022).

Therefore, we deem meritless Mother's challenge to the orphans' court's

Section 2511(b) determination.

In Mother's remaining challenge, she contends that the orphans' court

erred and abused its discretion by issuing a decree terminating her parental

rights without first addressing the issue of whether the minor child, who was

16 years old at the time, had the capacity to consent to an adoption pursuant

to 23 Pa.C.S.A. § 2711.[1]  ***See*** Mother's Brief at 16-22.[2]  We disagree.

---

[1] Section 2711 provides in relevant part:

**§ 2711. Consents necessary to adoption.**

**(a) *General rule.*** – Except as otherwise provided in this part, consent to adoption shall be required by the following:

(1)    The adoptee, if over 12 years of age.

…

(4)    The guardian of an incapacitated adoptee.

(5)    The guardian of the person of an adoptee under the age of 18 years, if any there be, or of the person or persons having the custody of the adoptee, if any such person can be found, whenever the adoptee has no parent whose consent is required.

23 Pa.C.S.A. § 2711(a)(1) and (4).

[2] Mother concedes that the orphans' court first addressed the issue of Child's capacity to consent to adoption only after it had entered the decree terminating Mother's parental rights and after the deadline for filing the present appeal had passed. ***See*** Mother's Brief, at 12.

In this Court's recent decision in **In re E.J.C.**, 335 A.3d 1222 (Pa. Super. filed May 2, 2025), we clarified that pursuant to Section 2512(b)(3),[3] where the Agency has filed the termination of parental rights petition, there is no requirement that the orphans' court contemplate adoption as part of its inquiry under Subsections 2511(a) and (b)  **Id.** at 1235-36.  Moreover, we observed that children were not "adoptees" under Section 2711 if no adoption petition was pending before the orphans' court.  **Id.** at 1236.  Here, because the facts before us place this case squarely under the rationale of E.J.C., we conclude Mother may not prevail in her Section 2711 argument.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 7/30/2025

---

[3] The citation to Section "2515(b)(3)" in **In re E.J.C.** appears to be a typographical error.  The correct citation is to 23 Pa.C.S.A. § 2512, "Petition for involuntary termination," which provides, in relevant part, that where an agency files the petition to terminate parental rights with respect to a child under the age of 18, "the petitioner shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists."  **See** Section 2512(a)(2) and (b)(3).