J-A10013-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: D.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1629 MDA 2021 |

Appeal from the Decree Entered November 17, 2021
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s):  084-ADOPT-2021

BEFORE:  PANELLA, P.J., KUNSELMAN, J., and KING, J.

MEMORANDUM BY PANELLA, P.J.:          **FILED: MAY 25, 2022**

A.M. ("Mother") appeals from the Cumberland County Court of Common Pleas' decree involuntarily terminating her parental rights to D.W. ("Child"). Mother claims the orphans' court erred in finding the Cumberland County Children and Youth Services ("the Agency") presented clear and convincing evidence she had failed to remedy the conditions that led to Child's removal from her care and that termination would be in the best interests of Child. Based largely on the thoughtful and well-reasoned analysis of the orphans' court, we affirm.

Child was born in 2011, and resided with Mother.[1] In January 2020, the Agency received a referral for Child based on concerns about housing and

---

[1] Child's biological father died in 2013. **See** N.T., 10/12/21, at 97.

Mother's substance use. Child was placed in the care of a family member while Mother sought inpatient treatment for what the Agency described as her "acute alcoholism." Recommendation for Adjudication and Disposition, 6/11/20, at 1. Mother checked herself out of the treatment program against medical advice in March 2020.

In May 2020, Mother was hospitalized for inpatient mental health treatment. Child was subsequently adjudicated dependent on June 11, 2020, and placed in the care of his paternal grandmother ("Grandmother"). He remains in Grandmother's care. Grandmother and Child live in Camp Hill, along with Child's half-sister, who has been adopted by Grandmother.

The Agency identified several permanency goals for Mother. Those goals included: 1) achieving and maintaining sobriety; 2) achieving and maintaining mental health stability; 3) obtaining stable housing; 4) participating in alcohol and drug screenings; and 5) maintaining contact with Child.

Following Child's dependency adjudication, Mother was in and out of inpatient and outpatient psychiatric treatment, as well as inpatient and outpatient alcohol treatment. When she was not in inpatient care, Mother lived in several locations, including various motels and recovery houses. In June 2021, she moved in with her boyfriend and his three children in Lancaster. Her visits with Child were inconsistent, with Mother frequently failing to show up for the scheduled visits. Similarly, Mother failed to show up for many of her alcohol screenings, including those set throughout August 2021.

On August 27, 2021, the Agency filed a petition to terminate Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (a)(5) and (a)(8) and (b). The orphans' court held hearings on the petition on September 8, 2021, October 12, 2021, and November 17, 2021.

The Agency's caseworker, Pricylla Derosier, testified at all three of the hearings. At the September and October hearings, Derosier testified about Mother's history with treatment for her alcohol use. She reported Mother went to an inpatient program for alcohol treatment on February 26, 2020, but left treatment against medical advice on March 10, 2020. *See* N.T., 9/8/21, at 8; N.T., 10/12/21, at 6. Derosier also reported Mother again entered inpatient alcohol treatment in September 2020, and then once again in February 2021. *See* N.T., 9/8/21, at 9; N.T., 10/12/21, at 7-8. At various times, Mother would begin but not complete outpatient alcohol treatment programs. *See* N.T., 9/8/21, at 8-9; N.T., 10/12/21, at 7-8. This included an intensive program Mother started on July 12, 2021, but left on July 26, 2021 because she did not feel comfortable with group therapy. *See* N.T., 9/8/21, at 9; N.T., 10/12/21, at 8. Derosier testified at the October hearing that "as of today, Mother has not participated or completed any drug and alcohol services." N.T., 10/12/21, at 8.[2]

---

[2] Similarly, the permanency plan dated August 25, 2021, two days before the termination petition was filed, stated "[Mother] has not completed drug and alcohol treatment." Permanency Plan, 8/25/21, at 2.

Derosier also testified regarding Mother's goal to complete alcohol screenings. Derosier recounted that Mother had repeatedly been referred for alcohol screenings between February 26, 2020 and August 16, 2021, but did not show up for many, if not most, of those screenings. *See* N.T., 9/8/21, at 10-12; N.T., 10/12/21 at 9-10. Derosier recognized that Mother had ongoing transportation issues regarding traveling from Lancaster, where she mostly lived during the life of this case, to the screenings in Carlisle. *See* N.T., 9/8/21, at 12. However, Derosier testified that family members had volunteered to assist Mother with those transportation issues, as had the Agency. *See id*.

Derosier also testified about Mother's history with mental health issues and her efforts to seek treatment for those issues. Mother has been diagnosed with post traumatic stress disorder, anxiety and depression. *See* N.T., 9/8/21, at 13; N.T., 10/12/21, at 10. She has also been the victim of domestic violence in previous relationships. *See* N.T., 10/12/21, at 39. Derosier recounted that Mother had required three separate psychiatric inpatient stays between May 2020 and February 2021. *See* N.T., 9/8/21, at 13-14; N.T., 10/12/21, at 11-12. The stays were prompted by delusions Mother was experiencing. *See* N.T., 10/12/21, at 11-12.

In March 2021, Mother completed a mental health evaluation and it was recommended that Mother engage in, among other things, trauma therapy. *See* N.T., 10/12/21, at 13. Mother did begin trauma therapy on April 13, 2021. However, her therapist discharged Mother in June 2021 because she believed

Mother needed to focus on getting sober through alcohol treatment. *See* N.T., 9/8/21, at 14-15; N.T., 10/12/21, at 13.

Derosier testified Mother had been prescribed medication and she believed Mother was compliant with taking that medication. *See* N.T., 9/8/21, at 15-16. However, based on conversations Derosier had with Mother's provider about mental health therapy, it was her understanding that "as of July 7, [Mother's] mental health had not been treated." N.T. 10/12/21, at 14. Derosier also testified Mother notified her in mid-August 2021 that she was on a waiting list to participate in a group program for mental health and alcohol treatment through Counseling Services Group ("CSG"), but Derosier never received any update regarding Mother's participation in that program and did not believe Mother had started it. *See* N.T., 9/8/21, at 10, 15.

Derosier also testified about Mother's visits with Child and "her inconsistency in attending the visits." N.T., 10/12/21, at 16. She reported Mother attended only three visits between August 2020 and December 2020, three of ten visits between December 2020 and February 2021, and four of ten visits between April 2021 and July 2021. *See id.* at 15-17.[3] Derosier acknowledged Mother was unable to drive as she had epilepsy, and this

_____

[3] Derosier testified she also offered Mother six visits between August 2, 2021 and October 8, 2021, but Mother either did not respond to those offers or was not able to attend the visits for various reasons. *See id.* at 18-19. Mother did have phone calls with Child. Beginning in May 2021, Mother's phone calls with Child took place during Child's therapy sessions, though Mother was not involved in all available phone calls. *See id.* at 24-25.

created transportation issues for her in terms of getting to the visits. *See id.* at 17, 30. Derosier recounted she had tried to secure service providers for supervised visitation in the Lancaster area without success. *See id.* at 17-18. She also testified she had arranged family group conferences to address transportation, but Mother had declined family members' offers to help with transportation. *See id.* at 22-23, 36.

Grandmother testified about the impact Mother's inconsistent contact and her failure to show up for visits had on Child. Grandmother testified that in the beginning, Child sobbed and was greatly disappointed when Mother failed to show up for her visits with him. *See id.* at 53. However, Grandmother stated that Child "changed his mindset" after he "was left standing on the back porch with a balloon and a gift in hand for Valentine's Day [in 2021] and [Mother] didn't show [for their visit]." *Id.* at 53. According to Grandmother, "[i]t took weeks [for him] to get over the disappointment." *Id.* at 56. Grandmother maintained Child is no longer disappointed by Mother's failure to show up for their visits, instead simply responding with "it figures." *Id.* at 53.

Grandmother confirmed she had filed an intent to adopt Child, and Child is happy about the decision. *See id.* at 52. Grandmother recognized that Child loves Mother, and wants to live with Mother. *See id.* at 52, 55. As for the latter, however, Grandmother testified Child has made it clear he does not want to "live with any more of [Mother's] boyfriends" and only wants to live

with Mother if she "is okay and is going to stay okay." *Id.* at 53. In the absence of those contingencies being met, he wants to live with Grandmother and his half-sister. *See id.* at 52-53.

Grandmother testified that, if she were allowed to adopt Child, she would continue to facilitate contact between Child and Mother's family. *See id.* at 54. She did not believe, however, that it was in the best interests of Child to have contact with Mother as it was too "damaging" to Child. *Id.* at 54. She confirmed she would be open to restoring Child's contact with Mother if she stabilized and it became in the best interests of Child to do so. *See id.* at 55.

Child's legal counsel, Damien DeStefano, echoed Grandmother's concerns regarding Mother's visits. He explained that Child "has been disappointed and disappointed …[h]e no longer becomes disappointed because he has been disappointed for so long." *Id.* at 108. DeStefano also acknowledged that Child loves Mother and wants to live with her. *See id.* at 108. At the same time, Child is concerned for Mother and wants to protect her. *See id.* DeStefano testified that, at this point, Child "loves his mom, but he is moving on." *Id.* at 109. He is happy and healthy with Grandmother. *See id.* at 108. DeStefano shared that Child wants the court - and not Child - to be the one to make a decision about the adoption because the "stress is crushing him." *Id.* at 109.

Child testified in chambers. Child told the court that he loves Mother, but he worries for her. *See id.* at 66. He stated he wants to live with Mother, as long as it is just the two of them. *See id.* at 63. Child testified he had not known Mother was living with her boyfriend and his three children, none of whom he had met. *See id.; id.* at 34-35. Child stated that he likes living with Grandmother and his sister and he would rather live with them than with Mother, her boyfriend and his three children. *See id.* at 64. Child confirmed he wanted to make sure nobody got hurt. *See id.* at 66.[4]

Mother also testified. She shared that she had previously been in two abusive relationships, with Child's father and with her estranged husband whom she had married in 2015 and separated from in 2020. *See id.* at 82. She testified she was aware Child did not want to live with her and another man, but that she moved in with her boyfriend because she could not afford a place on her own. *See id.* at 92-93. According to Mother, she would get her own place if the court gave her more time. *See id.* at 98.

Mother testified she believed her mental health was now stable. *See id.* at 87. She explained she had voluntarily sought inpatient psychiatric help and was on psychiatric medicine and attending a session with her psychiatrist every three weeks. *See id.* at 80, 87. Mother conceded she was not currently

---

[4] The court later informed the parties that Child broke down during his testimony. *See id.* at 104-105. Clearly, this was due to Child's distress and not the orphans' court's approach to questioning, which the record reveals was done with compassion and sensitivity.

receiving any other mental health treatment, but stated she was on a waiting list for counseling services at CGS. *See id.* at 83.

As for her alcohol use, Mother acknowledged she had relapsed in the past, and that she did not currently screen for alcohol. *See id.* at 78, 85-86. However, Mother testified she now attends AA meetings five times a week and checks in regularly with her recovery specialist at the RASE Project. *See id.* The recovery specialist confirmed Mother checks in weekly with her. *See id.* at 71.

Mother agreed she has had transportation issues, which caused her to miss visits with Child. She conceded family members had offered to help with her transportation, but stated she did not feel comfortable accepting the help. *See id.* at 84. The train schedule also did not work for her. *See id.* When asked why she had moved away from Child in Camp Hill to Lancaster, she replied her services and recovery house were in Lancaster, she enjoyed living in that area, and she didn't want to be near Grandmother. *See id.* at 88-89. Mother testified she wants Child home with her. *See id.* at 77.

Following the testimony at the October hearing, the orphans' court made it clear it had concerns about whether terminating Mother's parental rights to Child and eliminating Child's contact with Mother would be in Child's best interests. *See id.* at 102-103, 105, 109-110. The court stated it wanted to hear from Child's therapist and specifically, wanted to hear the therapist's opinion on whether termination would best serve Child's emotional well-being.

*See id.* at 112. The court continued the matter and issued an order directing Child's therapist to make himself available for the court to take his testimony. *See id.*[5]

The child's therapist, Seander Szeles, testified at the next hearing, which was on November 17, 2021. Szeles informed the court he had only been Child's therapist since May 2021, and that Child was still adjusting to discussing difficult topics with him. Given this, Szeles testified he did not feel as if he was in a position to give a definitive opinion on the emotional impact limiting Mother's contact would have on Child. *See id.* at 8-9, 11. He did testify, however, that Child had a strong bond with Grandmother and it was his belief that this bond, along with counseling, would be sufficient to address the emotional impact limiting contact with Mother would have on Child. *See id.* at 9.

Following Szeles's testimony, Derosier took the stand for the third time in the termination hearings. She testified Mother had missed the two visits with Child that had been scheduled since the last hearing in October. *See id.* at 15-16. Derosier also testified that, after the last hearing, Mother had moved to a friend's apartment in an attempt to change her housing situation, but had

_____

[5] According to the Agency, the Agency had asked the therapist to testify but was essentially told by the therapist's employer, Laurel Life, that its therapists would not testify at termination hearings. *See id.* at 110-111. Child's Guardian *Ad Litem* ("GAL") added that she had gotten the same response. *See id.* at 111.

since moved back in with her boyfriend in Lancaster. *See id.* at 16-17. When asked if Mother had made any progress on any of her goals since the last hearing, Derosier replied that Mother "has not made any progress." *Id.* at 17.

Both Child's GAL and DeStefano reiterated their position to the court that they continued to believe termination was in the best interests of Child. *See id.* at 18. DeStefano added that he had spoken to Child after Mother failed to show for the most recent visits, and Child was distraught and depressed. *See id.* at 19-20. Child also told DeStefano that if termination occurred, Child would see no difference in terms of the amount of contact he had with Mother. **See id.** at 20.

At the close of testimony, the orphans' court agreed that terminating Mother's parental rights would be in the best interests of Child, and ordered the termination. However, the court also ordered the Agency to schedule one final visit between Mother and Child, which would take place right after Child had a counseling session with his therapist to help him understand the situation. *See id.* at 21. The court also ordered that the visit be terminated if Mother did not show up one-half hour from the visit's scheduled start. *See id.* at 22.

Mother filed a timely notice of appeal, along with a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. In response, the orphans' court issued a Pa.R.A.P. 1925(a) opinion urging this Court to affirm its decree terminating Mother's parental rights. To that end, the orphans' court explained

the reasons supporting its conclusion that Mother had failed to remedy the conditions leading to Child's removal, as well as its reasons supporting its ultimate conclusion that termination would be in the best interests of Child. In her appellate brief, Mother challenges both of these conclusions.

When this Court reviews an order of a trial court terminating parental rights, we must accept the findings of fact and credibility determinations of the trial court as long as the record supports them. *See In the Interest of D.R.-W.*, 227 A.3d 905, 911 (Pa. Super. 2020). If the findings of fact are supported by the record, this Court may only reverse the order if the trial court made an error of law or abused its discretion. *See id*. We may not reverse merely because the record could support an alternate result. *See id*. Instead, we give great deference to the trial court because trial courts often have the opportunity to observe the parties first-hand over the course of multiple hearings. *See In re Adoption of K.M.G.*, 219 A.3d 662, 670 (Pa. Super. 2019). Further, the trial court, as the fact-finder, is free to believe all, part or none of the evidence presented and is likewise free to resolve any conflicts in the evidence. *See id*.

Termination of parental rights is controlled by Section 2511 of the Adoption Act. *See* 23 Pa.C.S.A. § 2511. Under Section 2511, a trial court must engage in a bifurcated process prior to terminating parental rights. *See In re L.M*., 923 A.2d 505, 511 (Pa. Super. 2007). Initially, the trial court must find that the party seeking termination has proven by clear and convincing

evidence that the parent's conduct satisfies any one of the eleven statutory grounds set forth for termination under Section 2511 (a). **See id.**; 23 Pa. C.S.A. § 2511 (a)(1-11). If the trial court finds that one of those subsections has been satisfied, it must then, pursuant to Section 2511(b), make a determination of the needs and the welfare of the child under the best interests of the child standard. **See In re L.M.**, 923 A.2d at 511; 23 Pa.C.S.A. § 2511(b).

Here, regarding the first prong of the analysis, the orphans' court noted that it was only required to find the Agency had proven by clear and convincing evidence that Mother's conduct met the grounds for any one of the subsections under Section 2511(a). The orphans' court focused its analysis on Section 2511(a)(8). It found the Agency met its burden pursuant to that subsection, which provides that parental rights may involuntarily be terminated on the grounds that:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8).

There is no dispute here that Child had been removed from Mother's care for more than 12 months at the time the termination petition was filed. "Once the 12-month period has been established, the court must next

determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the Agency supplied over a realistic time period." **In re Z.P.**, 994 A.2d 1108, 1118 (Pa. Super. 2010) (citation omitted).

Importantly, Section (a)(8) does not require an evaluation of a parent's current willingness or their future ability to remedy the conditions which led to the child's removal. **See id.** Rather, the proper inquiry under Section (a)(8) is whether these conditions continue to exist at the time the termination petition is filed, and not whether the parent has made progress towards remedying the conditions or whether there is a reasonable possibility that the parent can remedy the conditions at some point in the future. **See In re Adoption of R.J.S.**, 901 A.2d 502, 511-512 (Pa. Super. 2006).

Here, the orphans' court found in the first instance that Mother has had "a long and difficult history of mental health episodes and alcohol relapses," and had not met her goals related to either of those two conditions. Trial Court Opinion, 1/13/22, at 10. In terms of Mother's alcohol use, the orphans' court noted Mother: had experienced multiple relapses, with the last one being in February 2021; failed to appear for any of the five drug screenings scheduled most recently before the termination hearings began; and was not currently drug screening. **See id.** As for Mother's mental health, the court noted Mother had three inpatient stays for psychiatric care over the life of the case. In light of the severity of her mental health history, and the instability it caused for

Child, the court found it "unsettling that [Mother] is not currently in counseling or being proactive about her mental health treatment." *Id.* The court continued:

> We heard [Mother's] testimony that she is currently on a waitlist for counseling group services, but we are now well past the eleventh hour for [Mother] to obtain mental health counseling as she has been directed to do at every stage of [ ] Child's dependency and placement. [Mother] has been set up with outpatient mental health counseling in the past and has either not followed up or ceased participation for refusal to engage in group counseling. The fact remains that [Mother's] mental health triggered [ ] Child's removal from her care. Stability in mental health, clean alcohol screens, and alcohol treatment have been leading goals for well over a year and they remain unmet.

*Id.*

Mother takes issue with the orphans' court's assessment on several fronts. Initially, she argues that, contrary to what the orphans' court found, she has addressed her issues with alcohol. According to Mother, this is supported by her testimony that she attends AA meetings five times a week and speaks weekly with a recovery specialist. Mother also seems to argue that the orphans' court's reliance on the fact that she had frequently missed drug tests was misplaced given her testimony that she had trouble securing transportation to the drug test site and, in any event, had been randomly drug tested by one of the recovery houses where she had stayed.

Mother also maintains the orphans' court improperly found she was not seeking any mental health treatment. She contends the record establishes the opposite, and points to her testimony that she is compliant with taking her

prescribed medications and sees the psychiatrist who prescribes that medicine every three weeks.

It is true Mother testified to the above, though we note she did not present the testimony of her psychiatrist or point to any place in the record demonstrating any drug test results from the recovery house. Even so, it is also true that the record amply supports the orphans' court's finding that Mother had not met her goals regarding mental health stability and alcohol sobriety and that those conditions continued to exist at the time the termination petition was filed. This is made especially clear by Derosier's testimony that, although Mother had made repeated attempts to treat her mental health and alcohol use, she had yet to complete an alcohol program or successfully treat her mental health challenges. *See* N.T., 10/12/21, at 8, 14; *see id.* at 34-35 (Derosier testifying that Mother is not currently in trauma therapy).

Of course, any and all progress Mother has made towards achieving sobriety and mental health stability is commendable. However, the question before the court under Section (a)(8) was whether those conditions continued to exist at the time the termination petition was filed. The record supports the orphans' court's determination that they did.

However, Mother's alcohol use and mental health were not the only basis the court relied upon in finding that Mother's conduct met the grounds for termination pursuant to Section (a)(8). The court stated:

[M]ental health and sobriety aside, it remains for [Mother] to show stability to Child in appearing for more than the minority portion of visits, or, to put it frankly, just showing up for him. More than a year after removal of Child from [Mother's] care, we are waiting to see [Mother] exhibit real commitment to reunification. We heard [Mother's] testimony that she misses Child and wants him home with her, but as recently as between two of the termination hearings [Mother] promised Child she would appear for a visit and did not. [Mother] is also not taking every phone call with Child available to her. We are cognizant of [Mother's] transportation difficulties, but we heard competent evidence of record that solutions have been offered to [Mother], including gas cards and financial help from family members to get her bus passes and so forth, that [Mother] has declined. We therefore find the Agency has met its burden in proving satisfaction of Section 2511(a)(8).

*Id*. at 11 (omitting the word "the" preceding the word "Child" throughout).

We find no abuse of discretion on the part of the orphans' court that Mother had not met her goal of maintaining consistent contact with Child. The testimony from almost every witness at the termination hearings confirmed that Mother's contact with Child was, at best, sporadic. In arguing the orphans' court abused its discretion in relying on her inconsistent contact with Child as a reason for termination, Mother once again points to her ongoing transportation issues. Mother maintains she was "actively trying to find a transportation solution" and "did her best to attend visits." Appellant's Brief at 18. At the same time, however, Mother concedes the Agency offered various options to resolve her transportation issues, but maintains "none of those options were viable." *Id*.

Our Court has been clear that "[a] parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable

firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *In re Z.P.,* 994 A.2d at 1119; *see also In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (stating it is incumbent upon parents separated from their child to maintain steady and consistent contact with the child). Given the record before us, we fail to see how the orphans' court abused its discretion by reaching the conclusion that Mother had not done so here, and that her conduct warranted termination pursuant to Section (a)(8).

We therefore turn to Mother's argument that the Agency failed to establish that termination was justified under Section 2511(b). Pursuant to Section 2511(b), the trial court is required to examine whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. *See In re C.M.S.*, 884 A.2d 1284, 1286-1287 (Pa. Super. 2005). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into [the] needs and welfare of the child." *Id*. at 1287 (citation omitted).

In assessing the needs and welfare of a child, the trial court is required to consider the emotional bonds between the child and parent. *See In re Adoption of A.C.H.*, 803 A.2d 224, 229 (Pa. Super. 2002). It must also assess the effect severing those bonds will have on the child and whether termination would destroy an existing, necessary and beneficial relationship. *See id.*; *In re K.Z.S.*, 946 A.2d at 760. The extent of any bond analysis necessarily depends on the circumstances of the particular case. *See In re*

***K.Z.S.***, 946 A.2d at 763. The panel in ***In re K.Z.S.*** emphasized that, in addition to a bond examination, the court can equally emphasize the safety needs of the child and should consider the intangibles, such as the "love, comfort, security, and stability," the child might experience with the foster parent. ***Id.*** at 763 (citation omitted).

The orphans' court here clearly struggled with whether termination would serve the best interests of Child. It repeatedly verbalized that struggle on the record, noting Child's bond with Mother. ***See, e.g.***, 11/17/21, at 9. However, the court heard testimony from multiple witnesses spanning over three days. That testimony not only spoke of the negative impact Mother's failure to show up for Child was having on Child, but it also spoke of how well Child is doing with Grandmother. For instance, Derosier testified Child continues to do well with Grandmother and to be involved in a variety of activities, including Boy Scouts, the school play, and karate. ***See*** N.T., 10/12/21, at 20-21. Grandmother also makes the effort for Child to spend time with his maternal extended family. ***See id.*** Grandmother added that Child is making progress academically and has friends in the neighborhood. ***See id.*** at 51, 56. She reported that the manifestations of anxiety, such as body tics, Child was exhibiting when he first came to live with her stopped once he realized "things were stable." ***Id.*** at 57. DeStefano told the court Child is happy and healthy at Grandmother's, he is well taken care of at that home, and that "he loves it there." ***Id.*** at 108.

After hearing all of this testimony, along with the assessments of Child's counsel and the GAL, the orphans' court ultimately concluded that termination was in the best interests of Child. It explained its decision this way:

> Child, to put it mildly, is in a difficult position. All evidence we heard indicates that Child does wish to live with [Mother], or at least would if she were living alone, but he is aware of the problems that accompany that possibility and he knows well why he is living with [G]randmother. It is apparent that Child has experienced conditions in [Mother's] home stemming from her relationships with significant others that worry him about living with her in the future. [Mother], for her part, as we said, has not shown up for Child. Child's counsel represented to us that Child is in a constant state of depression waiting for [Mother] to "come through" and "she never does." This was echoed by other evidence we heard from Child's counselor, the caseworker, the GAL, and [G]randmother. [G]randmother appears hesitant to allow contact between Child and [Mother] in the future unless and until [Mother] can show consistency in her life and for Child. Child's counsel said when they discussed termination of [Mother's] rights and what that would mean, he told Child that [G]randmother may limit his time with [Mother] and Child responded that he "would see no difference," as he does not see [Mother] now.
>
> Child is happy and settled in his home with [G]randmother and [his half-sister,] has friends, and is doing well in therapy and in extra-curricular activities. His therapist feels his relationship with [G]randmother is beneficial and strong, and we agree. The GAL and counselor also agreed that [G]randmother and his continued counseling will help him to stabilize and that [Mother's] failures to appear for Child have made him retract from others. [G]randmother is hoping to get him out of it. We reiterate what Child told his counsel, that he wants nothing more than for this Court to make the decision about where he will live as the stress is crushing for him. We are convinced that it is in Child's best interests to make that decision now and that termination of [Mother's] rights is squarely in his best interests to allow him the relief and stability he urgently needs. Abundantly clear in the evidence is that Child has been let down by [Mother] far too many times, and [Mother] has yet to take consistent action showing that she is ready, willing or able to show him something different.

Trial Court Opinion, 1/13/22, at 12-13 (omitting the word "the" preceding the word "Child" throughout).

Mother does not dispute she has let Child down or that this has caused Child great anguish. Instead, she argues in her appellate brief the orphans' court erred in reaching its conclusion that termination was in Child's best interests without considering Child's bond with her and without ordering a formal bond analysis to determine the impact termination would have on Child. The orphans' court did not specifically address Mother's challenge to its bond analysis in its 1925(a) opinion because Mother did not raise the issue in her 1925(b) statement. This issue is arguably waived for that reason. **See Commonwealth v. Lord**, 719 A.2d 306, 309 (Pa. 1998). However, because Mother did raise the broader issue in her 1925(b) statement that the court erred in finding termination was in the best interests of Child, which necessarily encompasses a bond analysis, we will address her argument.

In doing so, we note in the first instance that nothing in Section 2511 (b) requires the court to order a formal bonding evaluation, nor is the court required to use expert testimony when conducting a bond analysis. **See In re Z.P.**, 994 A.2d at 1121. It is clear from the record that the court did consider Child's and Mother's bond and the impact severance of that bond would have on Child. Indeed, the court continued the termination hearings so it could hear from Child's therapist on this very point. While the therapist may not have been able to give the concrete answers the court was looking for, the therapist

- 21 -

did testify that he believed Child's strong bond with Grandmother and his continued engagement in counseling would allow Child to manage the emotional effects of termination.

The GAL was more direct. She testified that, after spending time and speaking with Child at length, she did not "believe [Child] will be irreparably harmed if termination is granted." N.T., 10/12/21, at 104. In fact, it was her opinion that it was in the best interests of Child to have Mother's rights terminated and for Child to be adopted by Grandmother. *See id.* at 103.

The orphans' court agreed. The court determined that Mother's inconsistent appearances in Child's life - her "failure to show up" for Child - have had a tremendously detrimental impact on Child. This determination finds support throughout the record. In fact, the record reflects that Child's current situation is, quite literally, tearing him apart. The orphans' court found that by terminating Mother's rights to Child, and allowing Child "to move on," as Child's counsel testified he is ready to do, Child would finally get the security and stability he so clearly deserves. Mother has simply not shown, nor do we find, that the court's conclusion that Child's best interests would be served by termination represented either an error of law or an abuse of discretion. Our standard of review therefore compels us to affirm. *See In the Interest of D.R.-W.*, 227 A.3d at 911.

Decree affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/25/2022