J-S29003-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: R.Z., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.Z., FATHER AND M.Z., MOTHER | |
| | No. 510 WDA 2022 |

Appeal from the Order Entered April 1, 2022
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): CP-02-AP-0000216-2021

| | |
|---|---|
| IN THE INTEREST OF: J.Z., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.Z., BIOLOGICAL FATHER AND M.Z., MOTHER | |
| | No. 511 WDA 2022 |

Appeal from the Order Dated April 1, 2022
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): CP-02-AP-0000215-2021

| | |
|---|---|
| IN THE INTEREST OF D.Z., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.Z., BIOLOGICAL FATHER AND M.Z., MOTHER | |
| | No. 512 WDA 2022 |

Appeal from the Order Entered April 1, 2022
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): CP-02-AP-0000217-2021

| | |
|---|---|
| IN THE INTEREST OF: A.Z., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |

J-S29003-22

|  | : |  |
| --- | --- | --- |
|  | : |  |
|  | : |  |
| APPEAL OF: C.Z., FATHER AND M.Z., | : |  |
| MOTHER | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | No. 513 WDA 2022 |

Appeal from the Order Dated April 1, 2022
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): CP-02-AP-0000218-2021

| IN THE INTEREST OF H.Z., A MINOR | : | IN THE SUPERIOR COURT OF |
| --- | --- | --- |
|  | : | PENNSYLVANIA |
|  | : |  |
| APPEAL OF: C.Z., FATHER AND M.Z., | : |  |
| MOTHER | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | No. 514 WDA 2022 |

Appeal from the Order Dated April 1, 2022
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): CP-02-AP-0000214-2021

BEFORE:   PANELLA, P.J., MURRAY, J., and COLINS, J.[*]

MEMORANDUM BY PANELLA, P.J.:          **FILED: October 14, 2022**

The Allegheny County Court of Common Pleas entered an order involuntarily terminating the parental rights of M.Z. ("Mother") and C.Z. ("Father") (collectively, "Parents") to their five children, H.Z., A.Z., D.Z., R.Z. and J.Z (collectively, "Children") (hereinafter referred to individually using only their first initial). The youngest, J, was born in April 2020, and the oldest, H, was born in January 2013, meaning the current ages of Children range from

_____

[*] Retired Senior Judge assigned to the Superior Court.

- 2 -

two to nine years. Parents appealed the orphans' court's termination order and submitted an appellate brief, through counsel, which is woefully undeveloped. However, we decline to find Parents' issues waived based on the brief's deficiencies as we are still able to glean Parents' general issues from their brief and conduct a meaningful review of the orphans' court's determinations in support of the order. *See Commonwealth v. Hardy*, 918 A.2d 766, 771 (Pa. Super. 2007) (stating this Court may find issues waived if defects in an appellate brief impede our ability to conduct meaningful appellate review). After conducting that review, we affirm.

Allegheny County's Office of Children, Youth and Families ("CYF") filed a petition to involuntarily terminate Parents' rights to all five Children on October 7, 2021. The facts leading up to the filing of that petition are not disputed.[1] Over the years, and before J was born, Mother would leave H, A, D and R unattended, sometimes in the car while it was still running. This resulted in multiple indicated ChildLine investigations. After Parents' house was found to be in deplorable condition, CYF removed H, A, D and R from Parents' care in December 2019.

---

[1] In fact, Parents' "Statement of the Case" section in their brief consists of a single paragraph with three general statements: CYF filed a petition to terminate Parents' rights, testimony was heard on that petition, and the orphans' court granted the petition. *See* Appellants' Brief at 1 (unpaginated); Pa.R.A.P. 2117 (outlining requirements for the "Statement of the Case" section of an appellate brief).

Parents were subsequently charged with several counts of endangering the welfare of children and neglect of animals. One condition of their bond prohibited Parents from having unsupervised contact with any minor children, including their own.

The orphans' court adjudicated H, A, D and R dependent on February 21, 2020. J was then born in April 2020. CYF obtained custody of J, and placed him in the same foster home where his siblings had been placed. J was also adjudicated dependent. J, D and R have remained in this original foster home since placement. H and A, meanwhile, have been with their current foster family since July 2021 and August 2021 respectively.

CYF developed family service goals for Parents to assist them in achieving reunification with Children. The goals included attaining mental health and housing stability, resolving the criminal charges filed against them, developing basic parenting skills, and engaging in therapeutic supervised visitation. Despite offering extensive services to Parents, CYF's concerns with Parents' mental health and their ability to parent Children continued, and CYF consequently filed the petition to terminate Parents' rights to Children pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (a)(5) and (a)(8) and (b) .

The orphans' court held a hearing on the petition on March 31, 2022. CYF called Michael Ferry, a CYF caseworker who had worked with the family since April 2020, to the stand. Ferry confirmed that the four older children were removed from Parents' home due to lack of parental supervision and the

condition of the home, and J was removed due to his siblings' active case and the no-unsupervised-contact-with-a-minor bail condition. ***See*** N.T., 3/31/22, at 45, 46. Ferry testified that the family service goals for both Mother and Father were focused on "mental health, parenting, housing for the family, supervised therapeutic visitation, resolving pending criminal charges, maintaining regular contact and cooperation as well as offenders' treatment." ***Id.*** at 49.

Ferry further testified that Mother was initially involved with mental health treatment, but was discharged in April 2021 because of her poor attendance. ***See id.*** at 51. Although Mother asserted she subsequently attended private therapy, CYF was not able to confirm these assertions because she refused to sign the release papers necessary for CYF to do so. ***See id.*** at 50-51. Ferry testified that at the time of the termination hearing, Mother had not satisfied either her mental health or parenting goals, and had not demonstrated progress in her supervised therapeutic visits. ***See id.*** at 52, 54.

As for Father, Ferry also maintained that Father had failed to satisfy his mental health goal, ***see id.*** at 58, his parenting goal, ***see id.*** at 59, or his supervised visitation goal, **see id.** at 59-60. Ferry confirmed that Parents had not yet resolved all of their outstanding criminal charges. In sum, when asked what progress Ferry felt Parents had made in the past two years, Ferry replied:

Minimal. And the biggest issue is parenting. We don't have documented, observed evidence that their parenting capacity has improved.

*Id.* at 65.

Laiken Eckenrod, an expert in trauma-focused therapy and one of the mental health clinicians who participated in the supervised therapeutic visits with the family, was able to elaborate on the issues regarding Parents' parenting skills.[2] Eckenrod testified to concerns with Parents' basic, "low-level" parenting skills, including safety, supervision, and hygiene. *Id.* at 98. She stated that while Parents consistently attended the supervised visits, they did not make any progress in improving their parenting skills during the two years she had worked with them. *See id.* at 99.

Eckenrod recounted that during the visits that occurred in a local park in the earlier days of COVID-19, "[t]here was no structure, no routine. No hygiene was ever encouraged. The children were often unsafe due to lack of supervision [requiring clinician intervention]." *Id.* at 102. For example, Children would run off to different areas of the park, including a creek, where Parents could not safely supervise them. *See id.* at 122. Children would also walk up to strangers and have conversations with them with no intervention from Parents. *See id.* Eckenrod continued:

_____

[2] Eckenrod worked at King and Associates, which was the agency CYF had referred Parents to for parenting support and the supervised therapeutic visitation.

> And then moving into office visits, just continued unsafe, continued lack of structure/routine for these children. So the children would often become emotionally disregulated. There would be no sense to what was happening in the visit, and that was ongoing even up until the end.

*Id.* at 102. For instance, the children would just walk out of the room to locations in the building unknown to Parents. *See id.* at 123. Eckenrod also testified that there were four separate occasions during visits where the youngest child, J, choked on food that was either inappropriate for a child his age (including a whole slice of pizza and a whole hamburger with multiple condiments) or not safely cut up. *See id.* at 123-124. This eventually led the court to issue an order prohibiting Parents from feeding J. *See id.* at 124.

Eckenrod stated that her attempts to address all of these issues were largely ignored by Mother and met with aggression and resistance by Father. *See id.* at 103.[3] Her professional opinion was that "reunification would not be in the best benefit of the children." *Id.* at 116.

Eleasah Grant also testified for CYF regarding Parents' parenting abilities. Grant is a parenting specialist and therapeutic visit supervisor, who was also employed by King and Associates at the relevant time. Grant conducted one-on-one sessions with Parents to try to help them develop their

---

[3] It was also noted that Father regularly brought a large knife with a broken cover to the visits, in violation of CYF's no-weapons policy. *See* Permanency Review Order, 8/27/21, at 3. The same order also noted that Father became combative, angry, and aggressive during visits, and referred to staff with derogatory names. *See id.* at 4.

basic parenting skill set, as well as participated in the supervised visits with the family. Grant testified that the one-on-one sessions were poorly attended by Parents, and were not successful, so those sessions were ultimately ended by CYF. *See id.* at 141-142.

However, Grant still tried to work with Parents on their parenting skills during the supervised visits with Children, but Grant stated Parents were completely unreceptive to her assistance. *See id.* at 144. At the time of the hearing, Grant continued to have concerns with Parents' ability to provide Children with structure and safety, *see id.* at 144-146, and she testified that she had not observed any lasting progress in the parenting skill set in either Mother or Father during the two years she had tried to work with them, *see id.* at 146.

Dr. Gregory Lobb, stipulated by the parties to be an expert in psychology and child psychology who had conducted a series of evaluations for the family, also testified for CYF at the hearing. He evaluated both Mother and Father individually, diagnosing them both with, *inter alia*, depressive disorders. *See id.* at 7-8. According to Dr. Lobb, Mother and Father each needed at least one, one-hour therapy session per week to begin to address their mental health issues, which neither was receiving. *See id.* at 9, 11.

He also testified that he evaluated Children interacting with Parents, as well as Children interacting with the foster parents. *See id.* at 15. Dr. Lobb stated that he had concerns with Parents' ability to offer consistency and

structure to Children, with Children essentially acting completely out of control when they were with Parents. *See id.* at 9-10, 15-16. In fact, Dr. Lobb testified he was forced to intervene at times due to safety concerns. *See id.* at 35-36. In contrast, Dr. Lobb recounted, Childrens' foster parents were structured and consistent with Children. *See id.* at 13-14. Dr. Lobb testified that it was clear Children felt safe and secure with their foster parents, and had a strong bond with them. *See id.* at 19, 22. As for Parents, Dr. Lobb testified that Children had an "insecure disorganized attachment" with them, which typically results from a parent's inconsistency when parenting a child. *See id.* at 19-20. According to Dr. Lobb, there was a bond between Parents and Children, but it had been damaged because of Parents' conduct. *See id.* at 22.

Caseworker Ferry also testified about Childrens' relationship with their foster parents. He explained that it was the foster parents who were the medical and educational decision makers for Children because Parents were unwilling to address medical concerns or to engage in behavioral health services for Children. *See id.* at 69. He testified that H and A were bonded to their foster parents, and felt comfortable and taken care of in their foster home. *See id.* at 70. Likewise, Ferry stated, the three younger Children had a very strong bond with their foster parents, and felt safe with them. *See id.* at 70-71. According to Ferry, Childrens' behavior had improved markedly since being placed in foster care. *See id.* at 71-73. It was his opinion that

termination would serve Childrens' needs and welfare because CYF had not "reached any kind of progress in terms of reunification or progress with goals leading to reunification. [Whereas Children] have safety and stability in their foster home." *Id.* at 73. Parents did not present any witnesses.

At the close of the testimony, the orphans' court recounted the testimony shared by CYF's witnesses, which the court clearly credited, and issued detailed findings of fact on the record. CYF summarized the court's findings as follows:

> [t]he court found that the children had been out of [Parents'] care well over twelve months, and the concerns that brought [Children] into care continued to exist. [P]arents have not internalized any of the parenting skills and have generally made no progress over two years of service. Furthermore, the court found that [Parents] have not been able to make gains in their skills in a reasonable amount of time, and there existed no evidence that they could meet [Childrens'] needs and welfare. Conversely, [Children] experience love, safety, and stability in their foster home, and adoption would provide a multitude of benefits to them.

Appellee CYF's Brief at 16-17 (record citations omitted). The orphans' court found that CYF had met its burden of demonstrating Parents' rights should be involuntarily terminated under Sections 2511 (a)(2), (a)(5), (a)(8) and (b). Parents appealed and raise two issues:

> The orphans' court did err as a matter of law and/or abuse its discretion in granting [CYF's] Petition to involuntarily terminate Father and Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (a)(5) and (a)(8)[.]
>
> The orphans' court did abuse its discretion in concluding that [CYF] met its burden of proving that termination of Mother and Father's parental rights would serve the needs and welfare of the children

pursuant to 23 Pa.C.S.A. § 2511(b) by clear and convincing evidence.

Appellants' Brief at 4, 6 (unpaginated)(unnecessary capitalization omitted).[4]

When this Court reviews an order of an orphans' court terminating parental rights, we must accept the findings of fact and credibility determinations of the court as long as the record supports them. *See In the Interest of D.R.-W.*, 227 A.3d 905, 911 (Pa. Super. 2020). If the findings of fact are supported by the record, this Court may only reverse the order if the orphans' court made an error of law or abused its discretion. *See id*. We may not reverse merely because the record could support an alternate result. *See id*. Instead, we give great deference to the orphans' court because those courts often have the opportunity to observe the parties first-hand over the course of multiple hearings. *See In re Adoption of K.M.G.*, 219 A.3d 662, 670 (Pa. Super. 2019).

Termination of parental rights is controlled by Section 2511 of the Adoption Act. *See* 23 Pa.C.S.A. § 2511. Under Section 2511, the orphans' court must engage in a bifurcated process prior to terminating parental rights. *See In re L.M*., 923 A.2d 505, 511 (Pa. Super. 2007). Initially, the court must find that the party seeking termination has proven by clear and convincing

_____

[4] Parents' brief does not include a "Statement of the Questions Involved" section, so their issues have been taken from their "argument" section. *See* Pa.R.A.P. 2111, Pa.R.A.P. 2116 (outlining requirements for "Statement of Questions Involved" section of appellate brief, including that the brief include such a section).

evidence that the parent's conduct satisfies any one of the eleven statutory grounds set forth for termination under Section 2511 (a). **See id.**; 23 Pa. C.S.A. § 2511 (a)(1-11). If the orphans' court finds that one of those subsections has been satisfied, it must then, pursuant to Section 2511(b), make a determination of the needs and the welfare of the child under the best interests of the child standard. **See In re L.M.**, 923 A.2d at 511; 23 Pa.C.S.A. § 2511(b).

Here, regarding the first prong of the analysis, the orphans' court found that CYF had proven by clear and convincing evidence that Parents' conduct met the grounds for termination of their parental rights under Sections 2511 (a)(2), (a)(5) and (a)(8). Parents do not challenge the subsections individually, but rather make the broad assertion that the trial court erred by terminating their parental rights under all three subsections. This Court has made clear, however, that it only needs to agree with the orphans' court that CYF met its burden as to any one subsection in order to affirm the termination of parental rights. **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we conclude that the orphans' court correctly determined that CYF met its burden pursuant to Section 2511 (a)(8), which provides that parental rights may involuntarily be terminated on the grounds that:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child

> continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8).

There is no dispute here Children had been removed from Parents' care for more than 12 months at the time the termination petition was filed. "Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the Agency supplied over a realistic time period." *In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010) (citation omitted).

Importantly, Section (a)(8) does not require an evaluation of a parent's current willingness or their future ability to remedy the conditions which led to the child's removal. *See id.* Rather, the proper inquiry under Section (a)(8) is whether these conditions continue to exist at the time the termination petition is filed, and not whether the parent has made progress towards remedying the conditions or whether there is a reasonable possibility that the parent can remedy the conditions at some point in the future. *See In re Adoption of R.J.S.*, 901 A.2d 502, 511-512 (Pa. Super. 2006).

Here, the orphans' court found that Parents had failed to make progress in their goals related to parenting skills, mental health, and supervised therapeutic visitation. This is amply supported by the record, as the above recitation of the testimony from the various witnesses make clear. Therefore, we fail to see how the orphans' court erred or abused its discretion by finding there were clearly grounds for termination under Section (a)(8).

Parents' only assertion in their argument section challenging the court's conclusion regarding Section 2511(a) is that Parents' "bond with the minor children should not be disturbed … [because termination] would cause irreparable harm to minor children." Appellants' Brief at 5 (unpaginated).

In the first instance, this summary assertion, without any attempt to incorporate any facts specific to their case, is decidedly undeveloped.[5] On top of the fact that the single assertion offered in support of Parents' argument is undeveloped, it also seemingly misconstrues the focus of 2511(a), which is on Parents' conduct. **See In re L.M.**, 923 A.2d 505, 511 (Pa. Super. 2007) (stating that the focus under Section 2511(a) is on the conduct of the parent, and the focus only shifts to the needs and welfare of the children under a best-interests-of-the-child standard when the court engages in the second part of the analysis under Section 2511(b)) .

In their summary of the argument section, Parents make the bald claim that the orphans' court erred by terminating their parental rights because that decision was based "largely" on Parents' inability to resolve their pending criminal charges and the bond conditions that were in effect because of those charges. Parents raise this assertion in the argument section of their brief, but only under their second issue related to Section 2511 (b). As noted above, the focus of Section 2511 (b) is not on Parents' conduct. **See id.**

---

[5] **See** Pa.R.A.P. 2119 (outlining requirements for the "Argument" section of an appellate brief).

Nonetheless, the record makes clear that the court's decision was not based "largely" on Parents' criminal charges or the bond condition prohibiting unsupervised contact with minors, but on Parents' failure to remedy several of the conditions which led to Children's placement. In any event, Ferry specifically testified that CYF would not have recommended moving to unsupervised contact even if the bond conditions were lifted given CYF's many concerns with parents' inability to safely parent Children. **See** N.T., 3/31/22, at 92; **see also id.** at 146 (Grant testifying she would have concerns for Childrens' safety if left unsupervised with Parents). Those continuing concerns about Parents' parenting skills and their ongoing incapacity to safely parent Children despite services were well documented in the record, and support the court's decision to terminate Parents' rights pursuant to Section (a)(8).

We therefore turn to Parents' assertion that CYF failed to establish that termination was justified under Section 2511(b). Pursuant to Section 2511(b), the orphans' court is required to examine whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the children. **See In re C.M.S.**, 884 A.2d 1284, 1286-1287 (Pa. Super. 2005). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into [the] needs and welfare of the child[ren]." **Id**. at 1287 (citation omitted).

In assessing the needs and welfare of the children, the orphans' court is required to consider the emotional bonds between the children and the

parent. *See In re Adoption of A.C.H.*, 803 A.2d 224, 229 (Pa. Super. 2002). It must also assess the effect severing those bonds will have on the children and whether termination would destroy an existing, necessary and beneficial relationship. *See id.*; *In re K.Z.S.*, 946 A.2d at 760. The extent of any bond analysis necessarily depends on the circumstances of the particular case. *See In re K.Z.S.*, 946 A.2d at 763. The panel in *In re K.Z.S.* emphasized that, in addition to a bond examination, the court can equally emphasize the safety needs of the children and should consider the intangibles, such as the "love, comfort, security, and stability," the children might experience with their foster parents. *Id.* at 763 (citation omitted).

Here, all of the witnesses at the hearing testified about Parents' inability to meet the basic needs of Children. Parents did not implement structure and consistency with Children during their visits, and Grant, Eckenrod and Dr. Lobb all testified they had to intervene while supervising Parents and Children in order to keep Children safe. There was a no-feeding order issued against Parents as they were unable to safely feed J. Moreover, as Ferry testified, Childrens' foster parents had been made the medical and educational decision makers for Children because of Parents' refusal to address various medical and behavioral needs of Children.

In terms of Childrens' emotional bond with Parents, Dr. Lobb testified that Children did not have a secure attachment with Parents, and that the bond they had with Parents had been damaged by Parents' conduct. Ferry

testified that, in contrast, all five Children were bonded with their foster parents, and felt safe and secure with them.

Dr. Terry O'Hara, who the parties stipulated was an expert in psychology and child psychology, also testified at the hearing regarding the bonding assessments he had completed with Children and Parents, and with Children and the two sets of foster parents. His conclusions were in line with those reached by Dr. Lobb and Ferry. According to Dr. O'Hara, H and A's bond with their foster parents was healthy and secure, as was D, R and J's bond with their foster parents. ***See*** N.T., 3/31/22, at 171, 172. Both sets of foster parents exhibited positive parenting skills, ***see id***. at 170-171, and provided Children with love, security and stability, ***see id.*** at 174.

In contrast, Dr. O'Hara testified that he did not have any evidence that Parents were in a position to care for Childrens' needs and welfare. ***See id.*** at 174-175. In fact, he indicated his concern that if Children were returned to Parents' care, there would be "pretty acute concerns for potential adverse childhood experiences." ***Id.*** at 176. Ultimately, Dr. O'Hara opined that termination of Parents' rights and adoption by the respective foster parents met the needs and welfare of Children, and the stability and safety Children receive in their foster homes would mitigate any potential negative impact from termination. ***See id***. at 175-177.

Based on this record, we have no trouble reaching the conclusion that the orphans' court did not err or abuse its discretion in determining that the termination of Parents' rights would serve the needs and welfare of Children.

In sum, then, we see no error or abuse of discretion in the orphans' court's determination that Parents' rights were properly terminated pursuant to Section 2511 (a)(8) and (b), and therefore affirm its order terminating Parents' rights to Children.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/14/2022