J-S39003-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M.F.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: T.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 916 MDA 2022 |

Appeal from the Decree Entered May 26, 2022
In the Court of Common Pleas of Luzerne County
Orphans' Court at No(s):  A-9107

BEFORE:  PANELLA, P.J., BENDER, P.J.E., and NICHOLS, J.

MEMORANDUM BY PANELLA, P.J.:             **FILED:  JANUARY 6, 2023**

T.S. ("Father") appeals the Luzerne County Court of Common Pleas' decree involuntarily terminating his parental rights to A.M.F.S. ("Child"). Father primarily argues the orphans' court abused its discretion by terminating his parental rights because the court failed to consider that he participated in certain parenting and drug and alcohol programs while he was incarcerated. We discern no such abuse of discretion, and we affirm.

Child was born in December 2017. Child's natural parents are Father and A.S. ("Mother"). Mother's parental rights to Child, along with her parental

rights to Child's half-sibling, were also involuntarily terminated. Mother has filed a separate appeal from that decree.[1]

The facts leading up to Father's termination are largely undisputed. Child was placed in the care of the Agency pursuant to an emergency shelter care order on May 31, 2019. At the time, Child lived with Mother and the location of Father was unknown. At the subsequent adjudication hearing, Father was ordered to submit to the Agency for a full assessment upon his location. It was later discovered Father was incarcerated.

The Agency eventually filed a petition to terminate Father's parental rights on January 7, 2021. At the time of the filing of the petition, Child had been in placement with her half-sibling and the same foster family for 19 months. The orphans' court held hearings on Father's termination petition, along with the petition to terminate Mother's parental rights also filed by the Agency on January 7, 2021. The hearings took place on July 28, 2021, September 15, 2021, January 31, 2022 and March 7, 2022.

At the hearing on January 31, 2022, the Agency presented the testimony of Anthony Bellizia, a caseworker for the Agency who had been involved with Child's case since August 2019. Bellizia testified that when he assumed

---

[1] Luzerne County's Children and Youth Services Agency ("Agency") mistakenly believes Father's and Mother's appeals have been consolidated. They have not, and we decline to do so now *sua sponte*. Mother's appeal involves separate facts, separate issues, and an additional child. Father is, to be clear, not the biological father of that additional child.

responsibility for Child's case, Father was incarcerated. He further testified he received a letter from Father asking about Child's location. ***See*** N.T., 1/31/22, at 10. According to Bellizia, he attempted to respond to Father's letter by mail but his letters were returned to the Agency by the prison mail system. ***See id.*** at 10.

Bellizia testified that Father was released from prison in May 2020. Father participated in a permanency review hearing for Child in June 2020, although Bellizia was unable to attend that hearing. ***See id.*** at 11. Bellizia subsequently learned that Father indicated during that hearing that he would contact the Agency to begin services and visitation. Father, however, never contacted the Agency, and Bellizia had no way of contacting Father. ***See id.*** at 11-12, 24.

Paul Guido, a supervisor at the Agency who supervised Child's case and who had attended the June 2020 permanency review hearing, expanded on Bellizia's testimony regarding that hearing. He explained that Father was asked to provide his telephone number and address at the meeting, but Father did not provide that information. ***See id.*** at 46. Instead, Father stated he would contact the Agency following the hearing, but never did so. ***See id.*** at 46. Guido acknowledged that this occurred during the COVID-19 pandemic, but testified that, even when the Agency's building was closed, he was able to receive communication from clients. Moreover, Guido testified, there was a

security officer outside the building to take written messages from anyone who appeared at the building when it was closed. *See id.* at 51.

Guido also emphasized that during the hearing, the hearing officer stressed to Father and Mother that Child had already been in care for twelve months. According to Guido, the officer "really took that opportunity to encourage both parents to take that opportunity to engage or re-engage .. in services at that point based upon the time line." *Id.* at 48.

Bellizia testified that Father did not reach out to the agency, have any contact with Child, or seek any services following that hearing and before he was arrested again in November 2020. *See id.* at 24, 37. The parties stipulated that Father was charged at that time with, *inter alia*, endangering the welfare of children, fleeing or attempting to elude officers, manufacturing, delivery and possession with intent, reckless driving, and driving with a suspended license, in addition to a slew of summary offenses.

Bellizia recounted he was finally able to locate Father in December 2020 at Columbia County Prison. *See id.* at 10-11. He called Father at the prison and was able to speak with Father and basically do an assessment at that time. *See id.* at 11. Bellizia reported that during their conversation, Father told Bellizia he had attended a drug and alcohol program and an Inside Out Dad program while he had been in prison. *See id.* at 12, 25-26. Father did not, however, provide any documentation related to those programs. *See id.* at 12. Bellizia testified that, following their conversation, he attempted to mail

Father a copy of Child's permanency plan, but that mail was also returned to the Agency. *See id.* at 11.

Bellizia also testified that he attempted to set up visitation for Father and Child while Father was incarcerated. However, he was unable to do so in light of the third-party visitation procedure used by the prison. *See id.* at 12-13, 24.

Bellizia reported that the conditions that led to Child's placement continue to exist. He further opined that he does not believe Father could or will remedy those conditions given that he has been incarcerated for all but six months of the life of this case. *See id.* at 11, 28-29. And, during that six months, Father did not contact Bellizia or have any contact with Child. *See id.* at 24.

Father also testified at the hearing on January 31, 2022. He stated he was incarcerated in the Columbia County Prison in May 2019, when Child, he later learned, was taken into custody. *See id.* at 55. He reported he was at Columbia County Prison until December 2019, when he was transferred to the State Correctional Institution ("SCI") at Pine Grove ("SCI Pine Grove"). *See id.* at 55. He testified that he participated in a drug and alcohol program called Therapeutic Community, along with some other programs, while at SCI Pine Grove. *See id.* at 56, 66-67. He stated he began the Inside Out Dad program, but was unable to complete the program because he was transferred to

Columbia County Prison on a writ for a period of time during the course of the program. *See id.* at 63.

Father reported he was incarcerated at SCI Pine Grove until May 2020, when he was released. Father stated he was out of prison from June 2020 to December 2020. Father testified that he participated in a permanency review hearing for Child in June 2020, and maintained that he did, contrary to what was reported by the Agency, provide his phone number to the Agency at that time. *See id.* at 60, 61. According to Father, following that hearing, he attempted to contact the Agency, but the Agency's building was not accessible to the public during July and August 2020 due to COVID-19. *See id.* at 60. Father maintained he went to the building at one point but nobody was there. *See id.* at 61-62. However, Father was not able to give the address of the building or describe what the building looked like. *See id.* at 69, 71. Father also maintained he left voicemails at the Agency but did not receive any return phone calls. *See id.* at 61-62. He stated that although he was in contact with Mother at least initially after his release, he did not ask Mother for the contact information for Bellizia. *See id.* at 75.

Father testified he was currently incarcerated at SCI Rockview for a parole violation but believed he would be released in October 2022. *See id.* at 68, 73. Following Father's testimony, the court set the next hearing date for March 7, 2022. Bellizia told the court he would attempt to set up visitation for Father and Child. Bellizia stated he had previously been told by SCI

Rockview that Father was at SCI Pine Grove, and he had not yet had a response to his inquiries there. *See id.* 97-98. Father's attorney clarified that Father had actually been in Columbia County Prison, transferred to SCI Smithfield, and then transferred again to SCI Rockview "so there could have been some problems there." *Id.* at 98.

At the hearing on March 7, 2022, Bellizia testified that Father had been able to have two phone visits with Child since the previous hearing. *See* N.T., 3/7/22, at 68. Bellizia stated he was unable to say whether there was any bond between Father and Child. *See id.* at 62, 65, 66.

Father also testified at the March 7, 2022 hearing. During this testimony, Father shed some light on his history with Child. He reported that he did not see Child for a time after Child was born but did see her before her first birthday and before he was incarcerated. *See id.* at 91. He testified that before the two recent phone visits, it had been "more than two years" since he had seen Child. *See id.* at 88. He maintained, however, that the phone visits had gone well and he believed he and Child share a bond. *Id.* at 87.

Following the hearings, the orphans' court entered a decree terminating Father's rights pursuant to 23 Pa.C.S.A. § 2511 (a)(2) and (b). Father filed a timely notice of appeal and a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. In its Pa.R.A.P. 1925(a) opinion, the orphans' court found it had not abused its discretion by terminating Father's rights given that Father had been incarcerated for all but six months of Child's dependency;

failed to make efforts to see Child or obtain services during the six months he was out of prison; and that, even if Father had participated in classes while in prison, he did not benefit from those classes as he had been rearrested on drug charges. *See* Orphans' Court Opinion, 7/27/22, at 28, 29, 33. Father now challenges the orphans' court termination decree with the following three issues:

1. Does the failure of the Court to consider the services Father completed in prison constitute reversible error?

2. Was the Court's determination against the weight of the evidence when the Agency did not assess the services performed by Father while incarcerated?

3. Did the Court err by granting a termination under circumstances whereby the Agency failed to provide services to Father, despite Father seeking the assistance of the Agency?

Appellant's Brief at 4 (suggested answers omitted).

When this Court reviews an order of an orphans' court terminating parental rights, we must accept the findings of fact and credibility determinations of the court as long as the record supports them. *See In the Interest of D.R.-W.*, 227 A.3d 905, 911 (Pa. Super. 2020). If the findings of fact are supported by the record, this Court may only reverse the order if the orphans' court made an error of law or abused its discretion. *See id*. We may not reverse merely because the record could support an alternate result. *See id*. Instead, we give great deference to the orphans' court because those courts often have the opportunity to observe the parties first-hand over the course of multiple hearings. *See In re Adoption of K.M.G.*, 219 A.3d 662,

670 (Pa. Super. 2019). Further, the orphans' court, as the fact-finder, is free to believe all, part or none of the evidence presented and is likewise free to resolve any conflicts in the evidence. ***See id***.

Termination of parental rights is controlled by Section 2511 of the Adoption Act. ***See*** 23 Pa.C.S.A. § 2511. Under Section 2511, the orphans' court must engage in a bifurcated process prior to terminating parental rights. ***See In re L.M***., 923 A.2d 505, 511 (Pa. Super. 2007). Initially, the court must find that the party seeking termination has proven by clear and convincing evidence that the parent's conduct satisfies any one of the eleven statutory grounds set forth for termination under Section 2511 (a). ***See id.***; 23 Pa. C.S.A. § 2511 (a)(1-11). If the orphans' court finds that one of those subsections has been satisfied, it must then, pursuant to Section 2511(b), make a determination of the needs and the welfare of the child under the best interests of the child standard. ***See In re L.M.***, 923 A.2d at 511; 23 Pa.C.S.A. § 2511(b).

Here, regarding the first prong of the analysis, the orphans' court found that the Agency had proven by clear and convincing evidence that Father's conduct met the grounds for termination of his parental rights under Section 2511 (a)(2), which provides that parental rights may involuntarily be terminated on the grounds that:

> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental

well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa. C.S.A. § 2511(a)(2).

Under Section 2511(a)(2), then, parental rights may be terminated if it is shown that: 1) there was repeated and continued incapacity of the parent; 2) such incapacity caused the child to be without essential parental care; and 3) the incapacity cannot or will not be remedied. *See In re N.A.M*., 33 A.3d 95, 100 (Pa. Super. 2011).

Significant to this appeal, our Supreme Court evaluated the relevance of a parent's incarceration to an orphans' court decision to terminate parental rights under Section 2511(a)(2) in *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012). There, the Supreme Court held that "incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under Section 2511 (a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied." *Id.* at 828.

Here, as the orphans' court pointed out and Father concedes, Father was incarcerated for much of the life of this case. *See* Appellant's Brief at 5. The orphans' court acknowledged that Father was not in prison for six months of the relevant time - from May 2020 to November 2020. The court looked at that period of time and found that Father, although out of prison, did not reach out to Bellizia or see Child during that time. *See* Orphans' Court Opinion,

7/27/22, at 29. While the court acknowledged Father's testimony that he made efforts to contact the Agency so that he could see Child during this six-month period, the court did not find Father's testimony to be credible. ***See id.*** at 33. The court also highlighted that Father was then rearrested and charged with drug and other offenses and was once again incarcerated. ***See id.*** The orphans' court determined that this conduct provided sufficient grounds to terminate Father's rights under Section 2511 (a)(2), and we see no abuse of discretion or error of law in this determination.

Father argues, however, that termination was improper because the Agency barely communicated with him during Child's time of dependency and failed to provide him with any services or make reasonable efforts to reunify him with Child. In the first place, this argument ignores the fact that Father's whereabouts were at times unknown to the Agency, that Father was incarcerated for a large portion of the relevant time, and that the Agency did not have contact information for Father during his period of non-incarceration. Moreover, our Supreme Court has held that Section 2511(a)(2) does not require "a court to consider the reasonable efforts provided to a parent prior to termination of parental rights." ***In re D.C.D.***, 105 A.3d 662, 672 (Pa. 2014) (holding that the provision of reasonable efforts to reunite parents and children is not a requirement for termination). Accordingly, we are unpersuaded by Father's argument in this regard.

Father also asserts that it is "unclear what further efforts Father could have engaged in to ensure he was able to resume his parental duties in a timely manner." Appellant's Brief at 19. In support, he points to his testimony that he gave his phone number to the Agency at the single permanency review hearing he attended, attempted to call the Agency on several occasions, and even went to the Agency's offices during the COVID-19 pandemic but was not able to speak to anyone. **See id.** at 18–19. Again, the trial court did not credit Father's testimony, as was its prerogative to do as the fact-finder, and we reject this claim on that basis alone. ***See In re Adoption of K.M.G.***, 219 A.3d at 670.

We therefore conclude that the orphans' court did not abuse its discretion or commit an error of law when it found that the Agency met its burden of establishing grounds for terminating Father's parental rights pursuant to Section 2511 (a)(2).

Turning to the second part of the termination test, which involves a needs and welfare analysis under Section 2511(b), we note that Father did not include any challenge regarding this section in his statement of questions involved or in his statement of matters complained of on appeal. Any argument regarding Section 2511(b) is therefore waived. ***See in re M.Z.T.M.W.,*** 163 A.3d 462, 466 (Pa. Super. 2017) (stating that "issues not included in an appellant's statement of questions involved and concise statement of errors complained of on appeal are waived").

- 12 -

Even if not waived, we see no abuse of discretion in the orphans' court's conclusion that termination of Father's rights would best serve the needs and welfare of Child pursuant to Section 2511(b).

"Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). In determining a child's needs and welfare, the orphans' court is required to consider "whatever bonds may exist between the children and [the natural parent], as well as the emotional effect that termination will have upon the [child]." *In re Adoption of A.C.H.*, 803 A.2d 224, 229 (Pa. Super. 2002) (citation omitted). At the same time, the court should also consider the intangibles, such as the "love, comfort, security, and stability," the child might have with the foster parent. *In re K.Z.S.*, 946 A.2d 753, 760 (Pa. Super. 2008) (citation omitted).

Here, as the orphans' court pointed out, Father has never had custody of Child. He has been incarcerated for much of the time Child has been in placement and had no contact with Child during the short time he was not incarcerated during this placement period. The orphans' court noted that Bellizia testified he was not able to determine if Father and Child had a bond. And although Father asserted he and Child do have a bond, even if this assertion had otherwise been substantiated, the mere presence of a parent's emotional bond with a Child does not preclude a finding that termination is in a child's best interests. *See In re N.A.M*., 33 A.3d at 103.

The orphans' court highlighted the love, comfort, security, and stability Child has with her foster parents, with whom Child has spent the majority of her life and who wish to adopt Child. The court noted Bellizia's testimony that Child lives with her half-sibling, and the two children are assimilated into the foster family's home. *See* Orphans' Court Opinion, 7/27/22, at 21. The court also noted Bellizia testified that the foster family meets the physical, developmental, and emotional needs of Child, and there is a bond between Child and her foster family. *See id*. Child calls the foster parents "Mom and Dad," and seeks them out for comfort and security. *See id.* The court further noted Bellizia opined that termination of Father's rights would not have a detrimental impact on Child. *See id.*

Based on the above, along with testimony from the foster father and a case manager who has worked closely with Child while in her foster home, *see id.* at 22-24, the orphans' court concluded that it was in Child's best interests to terminate Father's parental rights pursuant to Section 2511(b). Again, we see no abuse of discretion or error of law in this conclusion, even had Father properly raised a challenge to it.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 01/06/2023