J-S28002-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: THE ADOPTION OF: I.W., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.N.W., JR., FATHER | : : : : : : : | No. 423 WDA 2023 |

Appeal from the Order Entered March 8, 2023
In the Court of Common Pleas of Westmoreland County
Orphans' Court at No(s):  No. 66 of 2022

BEFORE:   PANELLA, P.J., OLSON, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY PANELLA, P.J.:                **FILED:  October 31, 2023**

J.W. ("Father") and A.B. ("Mother") are the biological parents of I.W., born in 2013. Mother and Father ended their relationship days after I.W.'s birth, and I.W. lived with Mother. Mother and Father did not have any legal custody agreement at that point, and although Father initially visited I.W., he did not have any contact with I.W. after she turned two years old. Father eventually filed a custody action in 2020, but he failed to meet the court-ordered prerequisites which would have allowed for visitation with I.W.

In September 2022, Mother filed a petition seeking to involuntarily terminate the parental rights of Father as Father, by that point, had not seen I.W. for at least six years. The Westmoreland County Court of Common Pleas

_____

[*] Former Justice specially assigned to the Superior Court.

held a hearing on the petition, at which both Mother and Father testified. Following the hearing, the orphans' court entered a decree granting Mother's termination petition and Father appealed. Father argues the orphans' court abused its discretion by granting the termination petition because it was Mother's actions which prevented him from seeing and having contact with I.W. over the years and because he has consistently paid child support for I.W. We do not agree. Instead, mindful of the great deference we are required to give orphans' courts in termination matters, we affirm.

While the certified record is relatively sparse, we note that it is undisputed that Father had no contact with I.W. for the majority of her life. The primary factual dispute in this case concerns the reasons why Father had no contact.

I.W. was born in Allegheny County in November 2013. Mother and Father lived together at the time. However, Mother and Father ended their relationship five days after I.W. was born, and Mother and I.W. moved out. Father visited I.W. several times but Mother then moved out of the area. Father has not seen I.W. since she was approximately two years old.

Mother began living with M.B. ("Stepfather") right after she left Father's residence, and Mother and Stepfather married in 2014. Mother and I.W. have lived with Stepfather almost the entirety of I.W.'s life, except for one brief period in which Mother and Stepfather were separated. The family, which also

includes Mother and Stepfather's five biological children, has moved several times.

Although Mother and Father initially communicated through Facebook, in early 2015, Mother blocked Father as Mother became uneasy communicating with Father. Mother has since blocked Father on Facebook numerous times and in fact, "Father has been blocked from Mother's Facebook for the majority of the past few years." Trial Court Opinion, 3/8/2023, at 7.

Father filed a petition seeking custody of I.W. for the first time in August 2020, when I.W. was approaching seven years old. Following a custody conciliation conference, the trial court entered an order in November 2020 awarding Mother primary physical custody but shared legal custody between Mother and Father. The court ordered Father to participate in parent-child reunification therapy as a prerequisite to starting visitation with I.W. Specifically, the court ordered the parties to engage in reunification therapy with William Bush, Ed.D., and further ordered Father and I.W. to participate in a minimum of four therapy sessions.[1]

Father and Mother eventually completed their intake requirements with Dr. Bush. However, because of scheduling difficulties with Dr. Bush, the trial court entered an order on September 22, 2021, changing the parties'

---

[1] This custody order is not in the certified record. However, none of the parties dispute the order's content.

reunification therapist to Bethanne Petrylak, LMFT. Father was to contact Counselor Petrylak within 48 hours to schedule an intake appointment.[2]

Father did not do the intake and Mother filed a petition for custody modification in October 2021, seeking primary physical and legal custody. The court held a custody conciliation conference and entered an order on January 7, 2022. The order maintained shared legal custody with Mother and Father but directed Father to complete an intake session with Counselor Petrylak on January 13, 2022 so that reunification counseling with I.W. could begin. Father was to pay for his intake session, and Mother and Father were to share the costs of the reunification therapy.

Again, Father did not complete the intake session as directed, and on January 20, 2022, Mother filed a praecipe for a pretrial conference. The court held a conference in March 2022, but Father failed to appear. The court therefore entered an order on March 22, 2022, granting sole legal custody of I.W. to Mother. However, the court also gave Father 30 days to request a second pretrial conference before the order became final. Father did not file any such request. He also did not complete his intake with Counselor Petrylak.

On September 9, 2022, Mother filed the petition to involuntarily terminate Father's parental rights, seeking to terminate Father's rights

---

[2] Again, this order is not in the certified record but once again, the parties do not dispute the content of this order.

pursuant to 23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), (a)(8) and (b). Father contested the petition.

The court held a hearing on the petition, which was attended by both Mother and Father and their counsel. Mother testified first. She explained that she lives with Stepfather, their five children, and I.W. *See* N.T., 2/21/2023, at 4. Mother explained that Father had not seen I.W. since I.W. was one and one-half or two years old. *See id.* at 10. I.W., according to Mother, has no idea who Father is. *See id.* at 23.

Mother testified that Father does not know who I.W.'s doctor is, does not know what school I.W. attends, and has never been to a parent-teacher conference for I.W. *See id.* at 16. Mother further stated that Father has never attended a birthday party for I.W., has never sent her a gift for her birthday or Christmas, and has never visited her over any holiday. *See id.* at 17-18. According to Mother, Father has never sent I.W. a card or a gift. *See id.* at 40-41. Mother acknowledged Father has paid child support for I.W. "off and on" since she sought it in 2015 or 2016. *See id.* at 15, 35.

Mother stated she blocked Father on Facebook in early 2015 but unblocked him when she asked Father to care for I.W., who was approximately one and one-half years old at the time, while Mother was in the hospital. *See*

*id.* at 28-29.[3] Mother conceded she "kept unblocking [Father] and blocking [Father]" on Facebook over the years. *Id.* at 29. She testified she "opened the lines of communication" with Father after the first custody hearing and Father did ask for pictures of I.W. through Facebook. *See id.* at 18. However, Mother stated that after sole legal custody was returned to her in March 2022, she decided not to send pictures and once again blocked Father on Facebook. *See id.* at 18, 31.

Mother explained that although Father filed for custody, he never received visitation rights to I.W. because reunification therapy had never been completed. *See id.* 14-15. Mother confirmed that Father failed to comply with the court orders regarding reunification therapy. *See id.* at 19.

Mother stated that I.W. has lived with Stepfather since she was five days old, and Stepfather has been I.W.'s "father figure [for] literally [her] entire life." *Id.* at 11, 20. Stepfather attends I.W.'s parent-teacher conferences, drives her to softball practices, and is the person I.W. goes to when she is scared. *See id.* at 20. I.W. calls Stepfather "dad," and "she is a dad's girl." *Id.* at 21, 23. Stepfather takes the children, including I.W., to the bus stop on school mornings. *See id.* at 22. Stepfather wants to adopt I.W., and I.W.

_____

[3] Mother testified that she originally "blocked [Father] after repeated messages of him stating that he would sign his rights away to [I.W.] for provocative pictures and videos of [Mother and Stepfather"]. *Id.* at 28.

wants Stepfather to adopt her and to have the same last name as Stepfather, Mother, and her siblings. ***See id.*** at 24, 44.

Mother testified she and Stepfather have moved a number of times in-state over the last several years. ***See id.*** at 33. She also testified she and Father did not leave on good terms, so she did not want to give him her address. ***See id.*** at 36. She clarified that "it wasn't that we didn't let him know where we were, it was more the fact that we [moved to] where was best for our family at the time." ***Id.*** at 27.

Father testified next. He testified he currently lives in West Virginia and has primary physical custody of one of his sons, C.W, and partial custody of two of his other children, E.W. and H.W. He agreed he has seen "very little" of I.W. since she was five days old, though I.W. and Mother did stay with him for about one week when I.W. was around nine months old. ***Id.*** at 51-52. According to Father, after Mother moved to Butler, Pennsylvania when I.W. was about nine months old, Father did not have any consistent contact information for Mother. ***See id.*** at 53. Father maintained Mother frequently blocked him on Facebook over the years. ***See id.*** at 53-54, 69.

Father stated that he learned of Mother's address from his former paramour in August 2020, and he filed the custody petition for I.W. ***See id.*** at 54-55. Father testified that, after the court ordered him to participate in reunification therapy, Father did his intake with Dr. Bush. ***See id.*** at 55. However, Father testified he had scheduling issues with Dr. Bush, and the

orphans' court eventually issued an order directing the parties to do reunification therapy with another counselor, Counselor Petrylak. ***See id.*** at 56.

Father explained that he did not follow through with intake or reunification therapy with Counselor Petrylak because he had lost his job and could not afford to do so. ***See id.*** at 56-57. Father maintained that he also could not afford to pay his attorney in the custody case for I.W., and the attorney withdrew. ***See id.*** at 56-57. Father further explained that he had failed to appear at the March 2022 hearing on Mother's petition to modify custody of I.W. because it conflicted with a custody hearing involving two of his other children. ***See id.*** at 71.

Father conceded that once he filed the petition seeking custody of I.W. and knew Mother's and I.W.'s address, he still did not send any cards, letters, or gifts to I.W. ***See id.*** at 61, 74. He claimed he was unsure whether Mother would give them to I.W. ***See id.*** at 61. Father said he did ask Mother on Facebook in January 2022 to send pictures of I.W., and although Mother initially indicated she would do so, she then blocked him on Facebook without sending him any pictures. ***See id.*** at 63-64.

Father testified that he did not seek relief from the court when Mother blocked him on Facebook, did not petition the court for funds to complete the reunification therapy and did not request a continuance of the March 2022

custody hearing for I.W. because he was unaware he could ask the court for any of this relief. *See id.* at 69-72, 75.

At the close of Father's testimony, the court asked I.W.'s attorney if she had met with I.W. She responded that she had, and she shared that I.W. wanted Father's rights to be terminated, and I.W. wanted to be adopted by Stepfather. *See id.* at 76. Similarly, the guardian *ad litem* ("GAL") reported that I.W. does not even know Father, and that "has to do with [Father]." *Id.* at 78. Rather, the only dad I.W. has known is Stepfather, and that is who she seeks out for support, comfort, and love. *See id.* at 77. I.W. wants to be adopted and wants to have the same last name as Mother, Stepfather, and her siblings. *See id.*

The court entered a decree granting Mother's petition and involuntarily terminating Father's parental rights to I.W. pursuant to Section 2511(a)(1) and (b). Father filed a notice of appeal and a Pa.R.A.P. 1925 statement of errors complained of on appeal. The orphans' court filed its Pa.R.A.P. 1925 opinion, asserting it had not abused its discretion in granting Mother's termination petition and directing this Court to its previous opinion in support of its decree for its reasoning substantiating its decision to terminate Father's rights.

When this Court reviews an order of an orphans' court terminating parental rights, we must accept the findings of fact and credibility determinations of the court as long as the record supports them. *See In the*

***Interest of D.R.-W.***, 227 A.3d 905, 911 (Pa. Super. 2020). If the findings of fact are supported by the record, this Court may reverse the order only if the orphans' court made an error of law or abused its discretion. ***See id***. We may not reverse merely because the record could support an alternate result. ***See id***. Instead, we give great deference to the orphans' court because those courts often have the opportunity to observe the parties first-hand. ***See In re Adoption of K.M.G.***, 219 A.3d 662, 670 (Pa. Super. 2019). Further, the orphans' court, as the fact-finder, is free to believe all, part or none of the evidence presented and is likewise free to resolve any conflicts in the evidence. ***See id***.

Termination of parental rights is controlled by Section 2511 of the Adoption Act. ***See*** 23 Pa.C.S.A. § 2511. Under Section 2511, the orphans' court must engage in a bifurcated process prior to terminating parental rights. ***See In re L.M***., 923 A.2d 505, 511 (Pa. Super. 2007). Initially, the court must find that the party seeking termination has proven by clear and convincing evidence that the conduct of the parent whose rights are at stake satisfies any one of the eleven statutory grounds set forth for termination under Section 2511 (a). ***See id.***; 23 Pa. C.S.A. § 2511 (a)(1-11). If the orphans' court finds that one of those subsections has been satisfied, it must then, pursuant to Section 2511(b), make a determination of the needs and the welfare of the child under the best interests of the child standard. ***See In re L.M.***, 923 A.2d at 511; 23 Pa.C.S.A. § 2511(b).

Here, regarding the first prong of the analysis, the orphans' court found Mother had proven by clear and convincing evidence that Father's conduct met the grounds for termination of her parental rights to I.W. under Section 2511(a)(1), which provides that parental rights may involuntarily be terminated on the grounds that:

> The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa. C.S.A. § 2511(a)(1).

In defining what constitutes parental duties, this Court has focused on the child's needs:

> Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. ... [Rather,] the parental obligation is a positive duty which requires affirmative performance.

*In re Z.P.*, 994 A.2d 1108, 1118-1119 (Pa. Super. 2010) (citation omitted)

*In re Z.P.* also made clear that "[a] parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." 994 A.2d at 1119; *see also In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (stating it is incumbent upon parents separated from their child to maintain steady and consistent contact with the child).

Given the record before us, we fail to see how the orphans' court abused its discretion by reaching the conclusion that Father had not done so here. The court explained:

> Father testified that prior to filing for custody, he did not see or contact [I.W.] because he was often blocked [on Facebook] by Mother or unaware of where she was living. Although Father may not have had Mother's exact address, Mother testified that she did not block Father until February 2015. Father could have arranged to see [I.W.] prior to being blocked or could have initiated custody proceedings in order to see [I.W.] when he was initially blocked in 2015.
>
> Mother contacted Father in 2015 and asked if he would be able to watch the child since she was in the hospital. Father did not make any further attempts to see [I.W.] or arrange visits with Mother after she contacted him.
>
> After Father filed for custody in 2020, Mother's address appeared on various Court Orders and documents. Father did not send [I.W.] any cards, gifts or further correspondence when he had Mother's address. He has not attended any school functions or birthday parties for the child. Father has not attempted to contact Stepfather in order to see or speak to [I.W.].
>
> Father did not participate in reunification services with [Bethanne Petrylak] which was necessary to begin visits with [I.W.]. While we understand Father's financial situation during that time, Father could have petitioned the Court for relief to assist with reunification efforts [but he did not]. Additionally, Father did not appear at the Pretrial Conference and did not request a second conference, which would have been necessary for Father to expand his custodial time.
>
> Father has not seen [I.W.] in over six years. Father is not involved in the child's life in any measurable way other than paying child support. It is clear that Father has not performed any parental duties for the child throughout her life. Mother has met her burden under [Section 2511(a)(1)].

Trial Court Opinion, 3/8/2023, at 8-9 (first and second original paragraph divided into two paragraphs).

The court's findings are supported by the record and based on that record, we cannot conclude that the trial court abused its discretion by determining that Mother had established that Father's parental rights should be terminated pursuant to Section 2511(a)(1).

Father's arguments do not convince us otherwise. Father first argues the court abused its discretion because, although Father had not seen or contacted I.W. in over six years, this failure to maintain contact with I.W. was a result of Mother blocking him from Facebook and moving around the state without disclosing her address. However, the orphans' court clearly considered these circumstances in its decision and found, in essence, that Father's minimal efforts in attempting to maintain contact with I.W. despite these circumstances were not sufficient.

We see no abuse of discretion in this determination. As this Court has stated, "parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his ... ability, even in difficult circumstances." *In re Z.P.,* 994 A.2d at 1119 (citation omitted). Here, Father did not offer any evidence of affirmative efforts on his part to locate I.W. and did not attempt to get the courts involved until I.W. was close to seven years old. And although the record reflects that Mother regularly blocked Father on

Facebook, Father did not offer any evidence that he took any steps to find alternative ways to contact Mother or to get the court involved to preserve his right to see his child.

Father also argues that once he did learn of Mother's address, he filed for custody and "the only reason that the custody action was not successful was that Father lost his job, and lost his custody attorney. Father also did not have the ability to follow through with Court-ordered reunification services at the time, due to his financial situation." Appellant's Brief at 24.

As an initial matter, we note that Father's filing of the custody petition and failure to comply with the court-ordered therapy came only after Father had not had any contact with I.W. for over six years. In any event, Father claims that he would have followed through with the custody action and reunification therapy had he not lost his job and his ability to pay for them. Again, the orphans' court explicitly considered Father's financial situation. While sympathizing with Father, the court noted that Father did not take any steps to notify the court that his financial situation was impeding his ability to comply with the court's order mandating reunification therapy. Father testified that he was aware that reunification therapy with I.W. was necessary before the court would allow him to proceed to visitation with I.W. *See* N.T. 2/21/2023, at 56. When he lost his job and he could not afford the therapy he needed to see his child, as the orphans' court said, "Father could have

petitioned the Court for relief to assist with reunification efforts," but he did not. Trial Court Opinion, 3/8/2023, at 9.

Father states repeatedly in his brief that he has remedied his financial difficulties and can now pay for reunification therapy. He also testified to that at trial, so the orphans' court was clearly aware of Father's asserted ability to now be able to pay for the therapy he needs to reunify with I.W. In the first place, this Court cannot look to the efforts of a parent to remedy the conditions underlying the termination petition after the petition has been filed. **See** 23 Pa.C.S.A. § 2511(b). Even if we could, as this Court has often indicated, a child should not be made to wait indefinitely for a parent to do what is necessary to establish a parent-child relationship and to assume parental responsibilities for that child. **See In re Z.P.**, 994 A.2d at 1119 (citation omitted) (stating "[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with the child's physical and emotional needs" (brackets omitted)).

Father also argues the trial court should not have terminated his parental rights because he has regularly paid child support to I.W. Again, the trial court clearly factored Father's payment of child support into its decision, finding that Father's financial support of I.W., without anything more, was not sufficient to preserve his parental rights. We see no abuse of discretion in this determination. **See in re Z.P.**, 994 A.2d at 1119 (holding that parental "duty

encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.").

Based on all of the above, we see no abuse of discretion in the court's conclusion that Father's parental rights were properly terminated pursuant to Section 2511 (a)(1).

We must therefore turn to the orphans' court's conclusion that terminating Father's parental rights to I.W. would best serve I.W.'s needs and welfare, as required by Section 2511(b). We also find this conclusion is supported by the record and does not amount to an abuse of discretion.

"Intangibles such as love, comfort, security, and stability are involved in the inquiry into [the] needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). In determining a child's needs and welfare, the orphans' court is required to consider "whatever bonds may exist between the children and [the natural parent], as well as the emotional effect that termination will have upon the children." *In re Adoption of A.C.H.*, 803 A.2d 224, 229 (Pa. Super. 2002) (citation omitted). At the same time, the court should also consider the intangibles, such as the "love, comfort, security, safety, and stability," the child might have with the person wishing to adopt the child. *Interest of K.T.*, 296 A.3d 1085, 1113 (Pa. 2023).

- 16 -

Here, there is no dispute that I.W. does not have a bond with Father. She has not seen him or had any contact with him since she was two years old. As Mother and the GAL said, I.W. does not even know who Father is. The only father I.W. has ever known is Stepfather, who wants to adopt I.W. I.W., in turn, has expressed her clear desire to be adopted by Stepfather. Mother, the GAL, and I.W.'s attorney all testified as to the bond I.W. has with her Stepfather, who is the one who has been parenting I.W. her entire life in Father's absence.

Of course, this is not to say that Father does not love or care for I.W. But he does not know her, and she does not know him. Father has not performed any non-financial parental duties for I.W. except for during what perhaps amounts to a total of a few weeks of I.W.'s life, who is now nine, almost ten, years old. The orphans' court stated that it was "convinced that termination of Father's parental rights would best serve the needs and welfare of [I.W.]" and based on the record before us, we can discern no abuse of discretion in that conclusion.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

J-S28002-23


DATE:  10/31/2023